**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| CHRISTMAS TREE SHOPS, LLC, *et al.*,[1] | Case No. 23-10576 (TMH) |
| Debtors. | (Jointly Administered) |
| Christopher Corbin and Rich Seronick, Individually, and on behalf of all others similarly situated, | Adversary No. 25-50003-TMH |
| Plaintiffs, | |
| v. | |
| Hilco Merchant Resources, LLC, | |
| Defendants. | |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Christopher Corbin ("**Corbin**") and Rich Seronick ("**Seronick**" and, together with Corbin, "**Plaintiffs**"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, by way of the within Amended Complaint against defendant Hilco Merchant Resources LLC ("**Hilco**"), allege as follows:

**I.     OVERVIEW**

1.     As is alleged more fully below, the Plaintiffs claim:

a)     Hilco, as joint employer of all Massachusetts-based Christmas Tree Shop, LLC ("**CTS**") employees who were either employed, as of August 12,

---

[1]The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number are as follows: Christmas Tree Shops, LLC (1207), Handil, LLC (1150), Handil Holdings, LLC (2891), Salkovitz Family Trust 2, LLC (8773), and Nantucket Distributing Co., LLC (1640).  The notice address for the Debtors is 64 Leona Drive, Middleboro, Massachusetts 02346.

2023, in CTS's Massachusetts-corporate office, or in any Additional Store located in Massachusetts (as that term is defined herein) (the "**Massachusetts Subclass**"), violated the Massachusetts Wage Act, G.L. c. 149, § 148, by failing to timely pay such individuals all wages earned during their final pay period, all accrued and unused vacation time due on the final day of employment, and additional compensation promised to Massachusetts-based Additional Store store-level employees who worked through the end of their respective store's liquidation sale (termed a so-called "retention bonus");

b) Hilco intentionally, or at a minimum, negligently misrepresented that all store-level CTS employees (the "**Nationwide Subclass**") would be paid a "retention bonus" in consideration for continuing to work through the close of the liquidation/going out of business sale.

c) Hilco was unjustly enriched as a result of its failure to pay the Nationwide Subclass their retention bonus.

## II. JURISDICTION

2. This is an adversary proceeding arising under chapter 11, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").  The United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") has subject matter jurisdiction over all civil proceedings arising under Title 11, or arising in or related to a case under Title 11, pursuant to 28 U.S.C. §§ 157(a) and 1334(b) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

3. This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

4. Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 7008-1 of the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), Plaintiffs consent to the entry of a final order or judgment by the Bankruptcy Court in connection with this Complaint to the extent it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5. Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### III.   PLAINTIFFS

6. Plaintiff Corbin is a resident of East Bridgewater, Massachusetts. At all times relevant hereto, Corbin was employed out of CTS's Middleborough, Massachusetts corporate office as Vice President, Enterprise Systems.

7. Plaintiff Seronick is a resident of Sharon, Massachusetts. At all times relevant hereto, Seronick was employed as a store-level associate out of CTS's Foxboro, Massachusetts store.

### IV.   DEFENDANT

8. Hilco is a foreign limited liability company headquartered in Northbrook, Illinois. Hilco specializes in, *inter alia*, going out of business retail liquidations.

### V.   FACTUAL ALLEGATIONS

9. CTS was a chain of big-box specialty retail stores headquartered in Middleborough, Massachusetts.

10. At all times relevant hereto, Mark Salkovitz ("**M. Salkovitz**") was the Executive Chairman of CTS.

3

11.     Upon information and belief, as of the beginning of 2023, CTS operated 82 retail stores throughout Massachusetts and other states.

12.     On January 6, 2023, CTS entered into an Agreement for Consignment of Memo Merchandise ("**Consignment Agreement**") with ReStore Capital (CTS), LLC ("**ReStore**"), an affiliate of Hilco.

13.     At all times relevant hereto, Ian Fredericks ("**Fredericks**") was the President of both Hilco and ReStore.

14.     Paragraph 32 of the Consignment Agreement provides that if CTS elected to conduct a "going-out-of-business" or similar liquidation sale, that it "shall engage the exclusive services of Hilco … to oversee, assist with, and other conduct such Liquidation Sale(s) …"

15.     On May 5, 2023, CTS (and related entities) filed voluntary petitions for relief under chapter 11, title 11 of the Bankruptcy Code in the Bankruptcy Court, Case No. 23-10576 (TMH) ("**Bankruptcy Case**").

16.     Upon information and belief, CTS's intention upon the bankruptcy filing was to find additional funding and keep CTS open and operating as a going concern by reorganizing, and not to liquidate the entirety of CTS.

17.     Upon information and belief, as part of the initial plan of reorganization for CTS at the time of its bankruptcy filing, ten stores were scheduled to close ("**Initial Stores**").

18.     On May 5, 2023, to facilitate the Initial Store closings, and the potential future closings of the 72 remaining CTS stores ("**Additional Stores**") that continued to operate following the Initial Store closings (Initial Stores and Additional Stores collectively "**Stores**"), CTS and Hilco entered into a so-called Letter Agreement Governing Inventory Disposition ("**Store Closing Agreement**").

4

3206936.1 118626-112745

19.     In relevant part the Store Closing Agreement authorized Hilco, in collaboration with CTS, to:

    a)     Provide supervisors to oversee the management of CTS Stores;

    b)     Recommend staffing levels for CTS Stores;

    c)     Recommend bonus and incentive programs for CTS Store employees;

    d)     Assist CTS in connection with managing and controlling CTS employee relations matters; and

    e)     Implement CTS's affiliate CareerFlex program for CTS's store level and other employees.

    f)     The Store Closing Agreement required CTS to use reasonable efforts to cause its employees to cooperate with Hilco and Hilco's supervisors.

    g)     The Store Closing Agreement authorized Hilco to supplement the merchandise being sold in the Stores with additional goods owned exclusively by Hilco.

20.     In effect, the provision set forth in paragraph 19(g) caused Hilco to utilize CTS employees to sell Hilco goods.

21.     The Store Closing Agreement, upon the mutual agreement of CTS and Hilco, authorized Additional Stores to be added to the scope of the Store Closing Agreement.

22.     In practice, and as forth in greater detail below, Hilco exercised the authority granted to it under the Store Closing Agreement over the Massachusetts Subclass and the Nationwide Subclass.

23.     Notwithstanding Hilco's ability to exercise substantial authority of CTS employees during the liquidation sales, the Store Closing Agreement purported to limit Hilco's liability to

3206936.1 118626-112745

CTS employees by including provisions pursuant to which Hilco could not be deemed an employer of CTS employees or liable to CTS employees for wages and/or other remuneration without regard to Hilco's actual conduct.

24.     Such provisions constitute "special contracts" under the Massachusetts Wage Act, G.L. c. 149, § 148 and are void as a matter of law under the Massachusetts Wage Act.

25.     On May 7, 2023, CTS filed an Emergency Motion for Interim and Final Orders, confirming, and authorizing CTS to assume, the Store Closing Agreement ("**Store Closing Motion**") in the Bankruptcy Case.

26.     The Store Closing Motion sought approval for payment of retention bonuses to CTS store-level employees (including store managers and assistant store managers) in the Initial Stores in an amount up to $162,230.

27.     Upon information and belief, the amount of retention bonuses to be paid to CTS store-level employees in the Initial Stores was jointly determined by CTS and Hilco.

28.     The Store Closing Motion also sought approval for the possibility of retention bonuses to be paid to CTS store-level employees (including store managers and assistant store managers) in any Additional Stores with the consent of the DIP Lenders and Prepetition Agent.

29.     The Store Closing Motion did not contemplate any further Bankruptcy Court approval for retention bonuses to be paid to CTS store-level employees in any Additional Stores once the retention bonus program set forth in the Store Closing Motion was approved by the Bankruptcy Court.

30.     In advocating for Bankruptcy Court approval of the retention bonus program, the Store Closing Motion states in relevant part, "[t]he success of the Closing Sales depends on store-

3206936.1 118626-112745

level employees continuing their ordinary course duties under the supervision of the Consultant [Hilco] and Debtors [CTS].

31.     In practice and consistent with the foregoing representation to the Bankruptcy Court, Hilco believed and appreciated that the success of the Closing Sales depended upon store-level employees continuing their ordinary course duties through the end of the Closing Sales, such that Hilco believed and appreciated that paying retention bonuses to store-level employees was necessary and justified.

32.     On May 31, 2023, the Bankruptcy Court approved the Store Closing Motion ("**Store Closing Order**").

33.     In relevant part, the Store Closing Order states:

> [Hilco] shall act solely as an independent consultant to the Debtors and shall not be liable for any claims against the Debtors other than as expressly provided in the Store Closing Agreement (including [Hilco's] indemnity obligations thereunder) or the Sale Guidelines, with the exception of acts of fraud, willful misconduct, or gross negligence, and with the exception of breach of the Store Closing Agreement by [Hilco], and, for greater certainty, [Hilco] shall not be deemed to be an employer, a joint or successor employer, or a related or common employer or payor within the meaning of any legislation governing employment or labor standards, health and safety, or other statute, regulation, or rule of law or equity for any purpose whatsoever, and shall not incur any successor liability whatsoever.

34.     Hilco violated the foregoing provision of the Store Closing Order inasmuch as its actual conduct demonstrates that it did not act solely as an independent consultant.

35.     At the same time CTS entered into the Store Closing Agreement with Hilco, CTS entered into a so-called Senior Secured, Super-Priority Debtor-in-Possession Revolving Credit Agreement ("**Loan Agreement**") with Eclipse Business Capital SPV, LLC and ReStore Capital, LLC ("**Restore Capital**"), another Hilco affiliate, as lenders (together, "**DIP Lenders**"), with Eclipse Business Capital, LLC as administrative agent ("**DIP Agent**").

7

3206936.1 118626-112745

36. The Loan Agreement provided CTS with ongoing funding for CTS operations following its bankruptcy filing.

37. Although following its filing of the Bankruptcy Case, CTS continued to operate as a debtor-in-possession in all respects, Hilco exercised at least an equivalent level of control over CTS and all CTS employees through Hilco's exercise of its authorized powers under the Store Closing Agreement and financial control through ReStore Capital.

38. To that end, following the filing of the Bankruptcy Case, Hilco installed supervisors to oversee and manage CTS stores, determined, together with CTS, staffing requirements for CTS stores (i.e., determined who should be retained and who should be terminated), regularly provided instruction and direction to CTS corporate and store level employees, and managed and controlled employee-relations matters.

39. Upon information and belief, on or about June 21, 2023, the DIP Agent delivered a Notice of Event of Default, DIP Termination Event, and Carve out Trigger Notice to CTS.

40. At or around that time (i.e., late June/early July 2023), the DIP Lenders, including Restore Capital demanded that all Additional Stores would be liquidated.

41. Upon information and belief, at or around this time (i.e., late June/early July 2023), Hilco requested and received an employee roster from CTS's human resources department, and jointly with CTS, determined which corporate and store-level employees would be terminated.

42. Upon information and belief, at or around that time (i.e. late June/early July 2023), Fredericks, on behalf of Hilco and ReStore, and M. Salkovitz, on behalf of CTS, discussed and agreed that CTS store-level employees (including store managers and assistant store managers) employed at the Additional Stores who stayed on through their respective store's final date of operation, would be paid a retention bonus.

8

43.     Upon information and belief, Fredericks specifically represented to M. Salkovitz that Hilco/ReStore would provide the funding for the retention bonuses.

44.     Upon information and belief, Fredericks and M. Salkovitz more specifically agreed that CTS Additional Store associates employed for one year or more (as of the date of their respective store closing) who remained employed through their respective store closing date would be paid a retention bonus equal to one week of wages, CTS Additional Store assistant store managers who remained employed through their respective store closing date would be paid a retention bonus equal to two weeks of wages, and CTS Additional Store store managers who remained employed through their respective store closing date would be paid a retention bonus equal to four weeks of wages.

45.     As a result of the foregoing agreement between Fredericks, on behalf of Hilco and ReStore, and M. Salkovitz, on behalf of CTS, at or around the start of Additional Store liquidation sales, CTS store level employees (including store managers and assistant store managers) were informed via email from CTS that they would be entitled to be paid a retention bonus if they met the criteria set forth in paragraph 44 above.

46.     Because Fredericks specifically authorized payment of retention bonuses set forth in paragraph 44, Hilco, intended, knew or should have known that CTS store level employees in the Additional Stores were going to be promised retention bonuses.

47.     At the time Fredericks agreed that Hilco/ReStore would provide funding for the retention bonuses, he either knew or should have known that Hilco/ReStore never intended to actually fund the retention bonus payments given CTS's default on the Loan Agreement and how poorly the liquidation sales were going.

3206936.1 118626-112745

48.     CTS Additional Store store level employees relied on the representations that were intended and caused to be made by Hilco/ReStore concerning the payment of retention bonuses, including the Plaintiff Seronick, and, as a result of their reasonable reliance, remained in their employment through the end of their respective store's liquidation sale.

49.     On or about July 26, 2023, M. Salkovitz and Frederick exchanged text messages concerning the retention bonuses. *See* text messages attached hereto as Exhibit A.

50.     As of July 26, 2023, Hilco and CTS had jointly determined that the liquidation sales at 23 of the Additional Stores were going to end on July 30, 2023, with the liquidation sales at the remaining 49 Additional Stores continuing through the end of August.

51.     M. Salkovitz initiated the aforementioned July 26, 2023 text exchange with Fredericks, stating the following:

> Hope all is well. I'm being told there is confusion on store employee retention bonuses. You had said you were paying it directly with a 1099. Or how should we handle? We need to make payments this week for people leaving now.

*Id.*

52.     In other words, M. Salkovitz, aware that retention bonuses were about to become due to the store-level employees who remained employed at the 23 Additional Stores with liquidation sales scheduled to end on July 30, 2023, was asking Frederick how Hilco intended to handle payment of those retention bonuses, believing that the retention bonus payments would be paid directly by Hilco (as opposed to through CTS's payroll) and then 1099'd to applicable employees.

53.     Frederick responded to M. Salkovitz's text as follows:

> Payments do not need to be paid this week. They were always in budget for the payroll after. I said I would handle one way or another. The issue was the final bonuses payable the week of 9/2 and if we need to pay those 1099

we would if we couldn't run another payroll. No bonuses should be paid
this week.

*Id.*

54.    In other words, Frederick acknowledged to M. Salkovitz that Hilco/ReStore committed to pay retention bonuses to all Additional Store store-level employees, and then explained: 1) retention bonuses for store-level employees who remained employed at the 23 Additional Stores with liquidation sales scheduled to end on July 30, 2023 did not need to be paid until the week after July 30, 2023; 2) retention bonuses for the 23 Additional Stores with liquidation sales scheduled to end on July 30, 2023 were always in the budget and could be run through ordinary CTS payroll the following week; and 3) the issue from Frederick's perspective was how to handle retention bonus payments to store-level employees who remained employed at the 42 Additional Stores with liquidation sales scheduled to end at the end of August, because once those stores closed, CTS may not have had the ability to process an additional payroll run (such that Hilco was prepared to pay those employees directly and issue a 1099 if necessary).

55.    M. Salkovitz replied to Frederick's test as follows:

Great. I'll take care of it on our end.

*Id.*

56.    Frederick then responded to M. Salkovitz's text as follows:

Before you put anything in payroll, our team needs to validate that people
actually met criteria. So, you should coordinate with Koos or Sheri/Gary.
We aren't paying for people who didn't meet criteria.

*Id.*

57.    Upon information and belief, Koos, Sheri, and Gary referred to in Frederick's text message are all Hilco employees.

11

58. Upon information and belief, Koos, Sheri, and Gary all reported to Michael Dwyer ("**Dwyer**"), Hilco Senior Vice President of Operations.

59. Upon information and belief, Dwyer reported to Fredericks.

60. In essence, and in practice, Hilco, in collaboration with CTS, oversaw and determined eligibility for retention bonus payments.

61. M. Salkovitz responded to Frederick's text as follows:

> Makes sense to me. We will be running a detailed report on Monday or Tuesday for the store (23) that are closing. It will show each employee along with full eligibility if met, and we'll get that to your team for approval.

*Id.*

62. Frederick responded and thanked M. Salkovitz for offering to provide the information Frederick requested to determine retention bonus eligibility.

63. Upon information and belief, sometime in late July or early August 2023, CTS provided Hilco with the retention bonus report referred to in the Fredericks/M. Salkovitz text message exchange.

64. Upon information and belief, after receiving the aforementioned retention bonus report and seeing the amount of money in retention bonuses due, and realizing that the liquidation sales had been a financial calamity, Hilco, contrary to Fredericks's prior representations, immediately disclaimed responsibility to pay retention bonuses.

65. Then, at or around 6:00 p.m. ET on August 12, 2023, Dwyer contacted CTS Senior Vice President of Store Operations Trace Hoyer ("**Hoyer**") and instructed Hoyer that all liquidation sales were ending and that all Christmas Tree Shop employees were to be terminated effective immediately.

3206936.1 118626-112745

66.    As a result, the Massachusetts Subclass was not timely paid the wages they earned during their final pay period, their accrued and unused vacation, and the retention bonuses (for store-level employees) on their final date of employment, and the Nationwide Subclass was not paid their retention bonuses.

## VI.    CLASS ALLEGATIONS

67.    Plaintiffs' claims meet the requirements of Fed. R. Civ. P. 23.

68.    The subclasses are comprised of the following individuals:

a)    Massachusetts Subclass: all Massachusetts-based CTS employees who were either employed, as of August 12, 2023, in CTS's Massachusetts-corporate office, or in any Additional Store located in Massachusetts.

b)    Nationwide Subclass: all CTS store-level employees who were employed in any non-Massachusetts Additional Store through the final date of the liquidation sale at their respective store.

69.    The subclass members are similarly situated to Plaintiffs and to each other because they were all subjected to the Defendants' unlawful practices.

70.    On information and belief, there are hundreds of individuals affected by the conduct described herein.

71.    There are questions of law and fact common to Plaintiffs and the subclass members that predominate over any questions affecting only individual members, such as whether Hilco was the joint employer of the Massachusetts Subclass and whether Hilco intentionally or negligently misrepresented that it would pay retention bonuses, or whether Hilco was unjustly enriched buy its failure to pay retention bonuses.

13

72.     Plaintiffs' claims are typical of the claims of the class members. Plaintiffs and all class members were subjected to and harmed by Defendants' conduct described above in the same manner.

73.     Plaintiffs will fairly and adequately protect the interests of the class members and have retained an attorney experienced in class action wage and employment litigation.

74.     A class action is therefore superior to other available methods for the fair and efficient adjudication of this controversy. A class action is also superior to other available methods for the fair and efficient adjudication for the following reasons:

a)      it is economically impractical for the subclasses to prosecute individual actions;

b)      the subclasses are readily definable;

c)      prosecution as a class action will eliminate the possibility of repetitious litigation;

d)      a class action will enable claims to be handled in an orderly and expeditious manner; and

e)      a class action will save time and expense and will ensure uniformity of decisions.

75.     Plaintiffs do not anticipate any difficulty in the management of this litigation.

**COUNT 1**
**Violation of M.G.L. c. 149, § 148 on behalf of the Massachusetts Subclass**

76.     Plaintiffs re-allege and incorporate by reference ¶¶ 1-75 above as if fully set forth herein.

77.     By its conduct as set forth herein, Hilco was the joint employer of the Massachusetts Subclass.

14

3206936.1 118626-112745

78.     By its conduct as set forth herein, Hilco violated M.G.L. c. 149, § 148.

79.     Hilco is liable for the treble the amount the Massachusetts Subclass's late paid wages (including the retention bonuses), less the single amount paid to date, plus reasonable attorneys' fees, expenses and prejudgment interest.

## **COUNT 2**
### **Misrepresentation on behalf of Massachusetts Subclass store-level employees and the Nationwide Subclass**

80.     Plaintiffs re-allege and incorporate by reference ¶¶ 1-79 above as if fully set forth herein.

81.     Hilco, through Fredericks, represented to CTS, that Hilco/ReStore intended to pay retention bonuses to Additional Store store-level employees who remained employed through the end of their store's respective liquidation sale.

82.     Upon information and belief, when it made said representation, Hilco never intended for Hilco/ReStore to fund the retention bonuses.

83.     In making said representation to CTS, Hilco intended for CTS to promise Additional Store store-level employees that they would be paid a retention bonus if they remained employed through the end of their store's respective liquidation sale.

84.     CTS, as a result of Hilco's representations, promised Additional Store store-level employees that they would be paid a retention bonus if they remained employed through the end of their store's respective liquidation sale.

85.     Additional Store store-level employees reasonably relied on the promise that they would be paid a retention bonus if they remained employed through the end of their store's respective liquidation sale.

86.     To date, Hilco has failed to pay the promised retention bonuses.

3206936.1 118626-112745

## COUNT 3
### Negligent Misrepresentation on behalf of Massachusetts Subclass store-level employees and the Nationwide Subclass

87. Plaintiffs re-allege and incorporate by reference ¶¶ 1-86 above as if fully set forth herein.

88. Hilco, through Fredericks, represented to CTS, that Hilco/ReStore intended to pay retention bonuses to Additional Store store-level employees who remained employed through the end of their store's respective liquidation sale.

89. In making said representation to CTS, Hilco intended for CTS to promise Additional Store store-level employees that they would be paid a retention bonus if they remained employed through the end of their store's respective liquidation sale.

90. CTS, as a result of Hilco's representations, promised Additional Store store-level employees that they would be paid a retention bonus if they remained employed through the end of their store's respective liquidation sale.

91. Additional Store store-level employees relied on the promise that they would be paid a retention bonus if they remained employed through the end of their store's respective liquidation sale.

92. Hilco failed to exercise reasonable care or competence in making the foregoing representations.

93. To date, Hilco has failed to pay the promised retention bonuses.

## COUNT 4
### Unjust Enrichment on behalf of Massachusetts Subclass store-level employees and the Nationwide Subclass

94. Plaintiffs re-allege and incorporate by reference ¶¶ 1-93 above as if fully set forth herein.

16

3206936.1 118626-112745

95.     All Additional Store store-level employees who worked through the end of the liquidation sales in their respective stores conferred a benefit upon Hilco.

96.     Hilco accepted the benefit of all Additional Store store-level employees who worked through the end of the liquidation sales in their respective stores

97.     Hilco's retention of the benefit would be inequitable without payment for its value.

**WHEREFORE**, the Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Hilco as follows:

A.     An order certifying this case as a class action and appointing the Plaintiffs and their counsel to represent the subclasses;

B.     A judgment and order awarding Plaintiffs and the Massachusetts Subclass their unpaid wages;

C.     A judgment and order awarding the Plaintiffs and Massachusetts Subclass store-level employees and the Nationwide Subclass all damages to which they are entitled on their misrepresentation and unjust enrichment claims;

D.     A judgment and order awarding Plaintiffs and the Massachusetts Subclass statutorily mandated treble damages;

E.     A judgment and order requiring Hilco to pay all reasonable attorneys' fees and the costs of this action as permitted by law;

F.     A judgment and order requiring Hilco to pay all permissible legal interest;

G.     Such other relief as this Court may deem just and proper.

3206936.1 118626-112745

## VII.   <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated: May 1, 2025
Wilmington, Delaware

*/s/ Katharina Earle*                                    -and –
Katharina Earle (No. 6348)
**GIBBONS P.C.**                                        Adam J. Shafran
300 Delaware Avenue, Suite 1015          **RUDOLPH FRIEDMANN LLP**
Wilmington, Delaware 19801                   92 State Street
Telephone: (302) 518-6300                      Boston, MA 02109
Email: kearle@gibbonslaw.com             Telephone: (617) 723-7700
                                                                Email: ashafran@rflawyers.com
-and-

Robert K. Malone (*pro hac vice* pending)
Mark B. Conlan (admitted *pro hac vice*)
Christopher P. Anton (admitted *pro hac vice*)
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
Email: rmalone@gibbonslaw.com
          mconlan@gibbonslaw.com
          canton@gibbonslaw.com

*Co-Counsel for Attorneys for Christopher Corbin and Rich Seronick,*
*Individually and on behalf of all others similarly situated*

18