**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| CHRISTMAS TREE SHOPS, LLC, *et al.*,[1] | Case No. 23-10576 (TMH) |
| Debtors. | (Jointly Administered) |
| CHRISTOPHER CORBIN and RICH SERONICK, Individually, and on behalf of all others similarly situated, | |
| *Plaintiffs*, | Adversary No. 25-50003-TMH |
| v. | |
| HILCO MERCHANT RESOURCES, LLC, | |
| *Defendant.* | **Related Adv. D.I. 77, 78** |

**PLAINTIFFS' OPPOSITION TO DEFENDANT HILCO MERCHANT RESOURCES, LLC'S MOTION TO DISMISS PLAINTIFS' AMENDED COMPLAINT**

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number are as follows: Christmas Tree Shops, LLC (1207), Handil, LLC (1150), Handil Holdings, LLC (2891), Salkovitz Family Trust 2, LLC (8773), and Nantucket Distributing Co., LLC (1640).  The notice address for the Debtors is 64 Leona Drive, Middleboro, Massachusetts 02346.

3225153.1 118626-112745

*/s/ Katharina Earle*
Katharina Earle (No. 6348)
**GIBBONS P.C.**
300 Delaware Avenue, Suite 1015
Wilmington, Delaware 19801
(302) 518-6300
kearle@gibbonslaw.com

Robert K. Malone (*pro hac vice forthcoming*)
Mark B. Conlan (admitted *pro hac vice*)
Christopher P. Anton (*pro hac vice forthcoming*)
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
rmalone@gibbonslaw.com
mconlan@gibbonslaw.com
canton@gibbonslaw.com

Adam J. Shafran (admitted *pro hac vice*)
**RUDOLPH FRIEDMANN LLP**
92 State Street
Boston, Massachusetts 02109
(617) 723-7700
ashafran@rflawyers.com

*Co-Counsel for Christopher Corbin and Rich
Seronick, Individually, and on behalf of all others
similarly situated*

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

RELEVANT BACKGROUND ......................................................................................... 3

ARGUMENT ................................................................................................................... 11

    I.     Plaintiffs have stated a claim against Hilco for violation of
           the Massachusetts Wage Act, G.L. c. 149, § 148 ............................................. 11

        A.  Plaintiffs have sufficiently alleged that Hilco was the joint employer
             of the Massachusetts Subclass ................................................................... 11

        B.  Plaintiffs have sufficiently alleged Hilco violated the Massachusetts
             Wage Act ..................................................................................................... 12

        C.  The provision in the Store Closing Agreement disclaiming liability
             for Hilco as an employer of CTS employees is a "Special Contract" in
             violation of the Massachusetts Wage Act and void as a matter of law ....... 14

        D.  The Law of the Case Doctrine supports and authorizes this Court to
             reconsider and reject the provision in the Store Closing Order
             disclaiming liability for Hilco as a joint employer ..................................... 15

        E.  The Provision of the Final Store Closing Order disclaiming liability
             for Hilco as an employer of CTS employees violates 28 U.S.C §
             959(b). ......................................................................................................... 18

    II.    Plaintiffs have stated claims for intentional and negligent
           misrepresentation ............................................................................................ 20

    III.   Plaintiffs have stated a claim for unjust enrichment against Hilco ................... 22

    IV.   Alternatively, the Court may modify the Store Closing Order striking any
           provisions disclaiming liability for Hilco as a joint employer. .......................... 24

CONCLUSION ................................................................................................................ 24

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Crocker v. Townsend Oil Co, Inc.,* 464 Mass. 1, 13 (2012) ....................................................15

*Depianti v. Jan-Pro Franchising Intern., Inc.,* 39 F. Supp. 112, 142 (D. Mass. 2014) ....................23

*Durbeck v. Suffolk Univ.,* 547 F. Supp. 133, 149-50 (D. Mass 2021)...................................24

*Elec. Data Sys. Corp. v. Attorney General,* 454 Mass. 63, 70 (2009)..................................15

*In re Borne Chemical Co., Inc.,* 54 B.R. 126 (Bankr. D. N.J. 1984)..................................19

*In re Broadstripe, LLC,* 435 B.R. 245, 255 n 37. (Bankr. D. Del. 2010) .........................................16

*In re Phillips Services (Delaware), Inc.,* 267 B.R. 62, 66 (Bankr. D. Del. 2001) ...........................15, 16

*In re PSA, Inc.,* 335 B.R. 580, 586 (Bankr. D. Del. 2005) ...............................................18

*In re Quanta Resources Corp.,* 730 F.2d 912, 919 (3rd Cir. 1984)...........................................18

*In re Scott Housing Systems, Inc.,* 91 B.R. 190 (Bankr. S.D. Ga. 1988)....................................19

*In re W.R. Grace & Co.,* 626 B.R. 217, 236 n. 13 (Bankr. D. Del. 2021) ........................................4

*In re Wall Tube & Metal Products Co.,* 831 F.2d 118 (6th Cir. 1987)...........................................18

*In re White Crane Trading Co.,* 170 B.R. 694, 702 (Bankr. E.D. Cal. 1994) ...................................18, 19

*Jiang v. Tokyo II Steak House, Inc.,* 616 F. Supp. 3d 167, 178-79 (D. Mass. 2022) ........................16

*Jinks v. Credico (USA) LLC,* 488 Mass. 691, 699 (2001) ..................................................11, 12

*Melia v. Zenhire, Inc.,* 462 Mass. 164, 170 (2012) .........................................................14

*Nunez v. Syncsort Inc.,* SJC-13709 .........................................................................14

*Reuter v. City of Methuen,* 489 Mass. 465, 468 (2022)...................................................13

*Sebago, Inc. v. Beazer East, Inc.,* 18 F. Supp. 2d 70, 86 (D. Mass. 1998) .......................................20, 21

*Tody's Service, Inc. v. Liberty Mutual Ins. Co.,* 496 Mass. 197, 200 (2025) ..................................22

*Tran v. Jenning Road Mgmt. Corp.,* 104 Mass.App.Ct. 276 (2024) ................................................12

**Statutes and Constitutional Provisions**

28 U.S.C § 959(b)2, 18

Massachusetts Wage Act, M.G.L. c. 149, § 148 .........................................................11,12,14

Massachusetts Wage Act, M.G.L. c. 149, § 150 .........................................................13, 14

**Rules**

Fed R. Civ. P. 12.. ...............................................................................................2, 4

ii

Plaintiffs Christopher Corbin and Rich Seronick, individually and on behalf of all others similarly situated (the "Plaintiffs") file this legal memorandum in opposition to Defendant Hilco Merchant Resources, LLC's ("Hilco") motion to dismiss (the "Motion") Plaintiffs' First Amended Class Action Complaint (the "Amended Complaint"), and in support hereof respectfully state as follows:

**INTRODUCTION**

On August 16, 2023, four days after Hilco made the call to send hundreds of Christmas Tree Shop, LLC ("CTS") employees packing without notice and pay, this Court admonished the professionals at CTS's conversion hearing that "this case is not going to be run on the backs of employees even if it's going to convert." (*See* conversion hearing transcript dated August 16, 2023 (the "CH Transcript"), attached as **Exhibit A** at 25:12-12). Two years later, Hilco's Motion asks the Court to do just that.

As alleged in Plaintiffs' Amended Complaint, Hilco, and its commonly owned and managed affiliate, ReStore Capital (CTS), LLC ("ReStore"), contracted via the Store Closing Agreement for overwhelming control over CTS's store liquidations. This contractual, and actual control in fact, renders Hilco the joint employer of the Massachusetts Subclass[2]. Hilco, however, argues that because the Store Closing Agreement, and court order approving it, disclaimed liability for Hilco as to CTS employees, that Hilco cannot be liable on Plaintiffs' wage and hour claims.

---

[2] The Amended Complaint defines the Massachusetts Subclass as "all Massachusetts-based CTS employees who were either employed, as of August 12, 2023, in CTS's Massachusetts-corporate office, or in any Additional Store located in Massachusetts. The Amended Complaint defines Additional Store(s) as the 72 remaining CTS stores that continued to operate following the Initial Store closings." The Amended Complaint defines the Initial Store(s) as the ten CTS stores scheduled to close as part of the initial plan of reorganization for CTS at the time of its bankruptcy filing.

While Hilco's control-and-dash business model is aspirational, it is unlawful under applicable state law. The provision in the Store Closing Agreement Hilco asks this Court to enforce constitutes a "special contract," void as a matter of law under the Massachusetts Wage Act. And this Court's Order approving the Store Closing Agreement, without prior notice to any affected employee and other glaring deficiencies, warrants rejection under the law-of-the-case doctrine. Finally, the provisions of the Store Closing Agreement and/or Final Store Closing Order that Hilco seeks to enforce are violative of 28 U.S.C. § 959(b) because no legitimate goal of federal bankruptcy law is furthered by allowing Hilco, a non-debtor liquidating agent, to use CTS's bankruptcy to circumvent the controlling Massachusetts Wage Act.

Once stripped of the unlawful contractual arrow in its quiver and viewed strictly through a Rule 12(b)(6) lens, Plaintiffs have pleaded sufficient facts to demonstrate Hilco was the joint employer of the Massachusetts Subclass and liable to them for violations of the Massachusetts Wage Act. Even a cursory review of Hilco's Motion reveals that it not just misapprehends but altogether neglects to mention the joint employer doctrine which indisputably renders Hilco an "employer" under Massachusetts law.

Hilco's Motion as to Plaintiffs' common law claims related to the promised retention bonus payments fairs no better. On the misrepresentation claims (intentional and negligent), Hilco's primary argument is that it cannot be liable because Plaintiffs do not allege that Hilco made any direct representation to CTS employees. That is of no consequence. The Amended Complaint alleges the representations made by Hilco in detail and includes verbatim excerpts from text messages sent by Hilco President Ian Fredericks ("Fredericks"), which confirm Hilco committed to pay retention bonuses and understood that CTS would transmit Hilco's representations to CTS employees. When one party causes another to make representations on its

2

3225153.1 118626-112745

behalf, the law is not so narrow to exonerate the original promisor simply because it did not directly transmit the misrepresentation. What is more, Plaintiffs' misrepresentation claims are not just sufficiently pleaded in the Amended Complaint, but Hilco's counsel all but conceded their validity. On August 16, 2023, at the hearing held to consider the conversion of this case to a chapter 7 liquidation, Hilco's counsel's repeated mantra was, "if it's in the budget, we're going to pay it." Retention bonuses were, however, in the final approved DIP budget, yet Hilco has not paid a penny of them to this day.

Finally, Plaintiffs have adequately stated a claim for unjust enrichment against Hilco. In sum, Plaintiffs have pleaded that CTS store-level employees conferred a measurable benefit on Hilco by working through the end of their respective stores' liquidation sales (which benefit was expressly acknowledged in the Store Closing Motion), that CTS employees expected to receive a retention bonus in consideration for their work, which Hilco knew of. Hilco's final argument that Plaintiffs cannot bring a claim for unjust enrichment because they have an adequate remedy at law is of no consequence. At the motion to dismiss phase, it is appropriate to plead theories of liability in the alternative.

Accordingly, Hilco's motion should be **<u>DENIED</u>**.

**<u>RELEVANT BACKGROUND</u>**

Hilco's Motion is not inaccurate with respect to its description of CTS's bankruptcy proceedings and allegations in the Amended Complaint, but it omits important procedural history and allegations in the Amended Complaint material to the adjudication of its Motion. Accordingly, Plaintiffs offer the following to supplement the omissions in Hilco's Motion.

As of at least January 6, 2023, CTS's Store Closing Agreement with Hilco was preordained. On that date, CTS entered into an Agreement for Consignment of Memo

3

Merchandise (the "Consignment Agreement") with ReStore, which provided that if CTS elected to conduct a "going-out-of-business" or similar liquidation sale, CTS was required to "engage the exclusive services of Hilco . . . to oversee, assist with, and otherwise conduct such Liquidation Sale(s) . . . ." (Consignment Agreement, Bankr. D.I. 24 at Ex. A, at 12, ¶ 32).[3]

CTS did just that. On May 5, 2023, the date of CTS's bankruptcy petition, Hilco and CTS consummated the Store Closing Agreement. (Store Closing Agreement, Bankr. D.I. 20 at Ex. A). No CTS employee was a party to the Store Closing Agreement and no putative class member in this case was covered by the Store Closing Agreement at the time of its execution. (*Id*. at introductory paragraph) (defining the initial scope of the Store Closing Agreement limited to the ten CTS stores listed in Exhibit A to the Store Closing Agreement).

The Store Closing Agreement left open the ability for CTS and Hilco to add further stores to Store Closing Agreement's ambit, and thereby subject additional CTS employees to Hilco's substantial authority. (*Id*.)

To that end, the Store Closing Agreement authorized Hilco to:

- Provide supervisors to oversee the management of CTS stores;

- Recommend staffing levels for CTS stores;

- Recommend bonus and incentive programs for CTS store employees;

- Assist CTS in connection with managing and controlling CTS employee relations matters; and

---

[3] Hilco correctly notes that on a 12(b)(6) motion to dismiss, courts can take judicial notice of its own docket entries and orders, and docket entries and orders from other courts. *See In re W.R. Grace & Co.*, 626 B.R. 217, 236 n. 13 (Bankr. D. Del. 2021 (citing *Southmark Prime Plus, L.P. v. Falzone*, 776 F.Supp. 888, 892 (D. Del. 1991). To add context to the allegations in the Amended Complaint, Plaintiffs reference relevant pleadings and orders throughout this opposition.

3225153.1 118626-112745

- Implement CTS's affiliate CareerFlex program for CTS's' store level and other employees.

(*Id*. at 2, § C(i) (Agent's Undertakings)).

The Store Closing Agreement mandated that CTS cause its employees to cooperate with Hilco and its supervisors, (*id*. at 2, § C(ii) (Merchant's Undertakings), which included Hilco using CTS employees to sell additional goods owned exclusively by Hilco. (*Id*. at 6, § J (Additional Agent Goods)).

Notwithstanding the fact that the foregoing provisions are textbook indicia of joint employment, the Store Closing Agreement describes Hilco as an "independent consultant." (*Id*. at 8, § N (Independent Consultant)). And, without any regard to Hilco's actual conduct, the Store Closing Agreement disclaims liability for Hilco as an employer, stating, "[Hilco] shall have no liability to [CTS's] employees for wages . . . and employees shall not be considered employees of [Hilco]." (*Id*. at 3, § C(ii) (Merchant's Undertakings)).

In consideration of Hilco's services, the Store Closing Agreement provided that Hilco would "earn a fee equal to two percent (2.0%) of the Gross Proceeds of Merchandise[4] sold at the Stores," (*id*. at 3, § E (Agent Fee and Expenses in Connection with the Sale)), "seventeen and one-half percent (17.5%) of the Gross Proceeds of the sale of the FF&E," (*id*. at 6, § I (Furniture, Fixtures and Equipment)), 93.5% "of the gross proceeds (excluding Sale Taxes) from the sale of the Additional [Hilco] Goods," (*id*. at 6, § J (Additional Agent Goods)), and "thirty percent

---

[4] Merchandise is defined as "all goods, saleable in the ordinary course, located in the Stores on the Sale Commencement Date (defined below). 'Merchandise' does not mean and shall not include: (1) subject to Section K, goods that belong to sublessees, licensees or concessionaires of [CTS]; (2) owned furnishings, trade fixtures, equipment and improvements to real property that are located in the Stores (collectively, 'FF&E'); or (3) damages or defective merchandise that cannot be sold." (*Id*. at 1, § A (Merchandise)).

5

(30%) of the receipts (net of sales taxes for all sales of [CTS] Consignment Goods." (*Id*. at 7, § K (Consignment Goods)).

On May 7, 2023, CTS sought court approval of the Store Closing Agreement by filing their *Emergency Motion for Interim and Final Orders (I)(A) Confirming on an Interim Basis, that the Store Closing Agreement is Operative and Effective (B) Authorizing, on a Final Basis, the Debtors to Assume the Store Closing Agreement, (II) Authorizing and Approving Closing Sales Free and Clear of All Liens, Claims, and Encumbrances, and (III) Granting Related Relief* (the "Store Closing Motion"). (Store Closing Motion, Bankr. D.I. 20). Notice of the Store Closing Motion was not given to any CTS employee, including the Plaintiffs and all putative class members in this case. (Certificate of Service re Store Closing Motion, Bankr. D.I. 102).

The Store Closing Motion reconfirmed the scope of Hilco's authority over CTS employees as stated in the Store Closing Agreement and sought approval for Hilco to "provide such other related services deemed necessary or appropriate by [CTS] and [Hilco]." (Store Closing Motion, Bankr. D.I. 20, at 5, ¶ 10). The Store Closing Motion noted that CTS and Hilco collectively established the store closing budget, (*id.*), which included a request for authority to pay retention bonuses "with respect to any Additional Stores with the consent of the DIP Lenders and Prepetition Agent, for the Store employees, including Store managers and assistant managers to incentivise these employees to complete the Closing Sales." (*Id*. at 20, ¶ 17). In seeking approval for retention bonuses to Additional Store employees without further court approval, the Store Closing Motion noted that "payments . . . to Store Bonus Program participants [were] . . . to ensure successful consummation of the Closing Sales . . . [and to] maximize stakeholder value through the Closing Sales at a time when those employees' positions will soon be terminated." (*Id*. at 14, ¶¶ 17-18). In no uncertain terms, the Store Closing Motion advocates for the payment

3225153.1 118626-112745

of retention bonuses by stating, "[t]he success of the Closing Sales depends on store-level employees continuing in their ordinary course duties *under the supervision of* [*Hilco*] and [CTS]." (*Id*. at 14, ¶ 18) (emphasis added). Later, the Store Closing Motion reiterates that Hilco was being retained "to manage the Closing Sales." (*Id*. at 16, ¶ 22).

On May 31, 2023, this Court entered a *Final Order (I) Authorizing, on a Final Basis, the Debtors to Assume the Store Closing Agreement, (II) Authorizing and Approving Closing Sales Free and Clear of All Liens, Claims and Encumbrances, and (III) Granting Related Relief* (the "Final Store Closing Order") (Final Store Closing Order, Bankr. D.I. 201). Notice of the Final Store Closing Order was not given to Plaintiffs and the putative class. (Certificate of Service re Final Store Closing Order, Bankr. D.I. 362; Amended Certificate of Service re Final Store Closing Order, Bankr. D.I. 375). The Final Store Closing Order was issued before the decision to liquidate any of the Additional Stores where all of the putative class members in this matter worked. (Adv. D.I. 70, at ¶¶ 39-40).

While the Final Store Closing Order purports to prospectively absolve Hilco of joint employer liability, it required Hilco to act solely as an independent consultant as a prerequisite. In relevant part, the Final Store Closing Order states:

> [Hilco] **shall act** solely as an independent consultant to the Debtors and shall not be liable for any claims against Debtors other than as expressly provided in the Store Closing Agreement . . . with the exception of acts of fraud, willful misconduct, or gross negligence, and with the exception of breach of the Store Closing Agreement by [Hilco], and, for greater certainty, [Hilco] shall not be deemed to be an employer, a joint or successor employer, or a related or common employer or payor within the meaning of any legislation governing employment or labor standards . . . .

(Final Store Closing Order, Bankr. D.I. at 25, ¶ 48) (emphasis added).

In practice, Hilco did not act solely as an independent consultant. Following entry of the Store Closing Order and subsequent Notice of Event of Default from the DIP Agent in or about

7

late June/early July 2023 (which in turn led to the inclusion of all Additional Stores in the ongoing liquidation sales), Hilco: installed supervisors who oversaw and managed all CTS stores, determined which CTS employees would be retained and which would be terminated, regularly provided instruction and direction to CTS corporate and store level employees, and managed and controlled CTS employee-relations matters. (Adv. D.I. 70, at ¶¶ 38-40). This included, for example, Hilco requesting and receiving an employee roster from CTS's human resources department and determining which corporate and store-level employees would be terminated. (*Id*. at ¶ 41).[5]

At or around the same time, and as pleaded in the Amended Complaint, Fredericks, President of both Hilco and ReStore, specifically represented to Mark Salkovitz ("Salkovitz"), CTS's Executive Chairman, that Hilco/ReStore would fund retention bonuses for Additional Store employees. (*Id*. at ¶¶ 42-43).[6] Shortly thereafter, CTS Additional Store employees were informed via email from CTS that they would be paid a retention bonus if they met the criteria described in footnote four. (*Id*. at ¶ 45). Because Fredericks specifically authorized payment of the retention bonuses, he intended, knew or should have known that CTS Additional Store employees were going to be promised retention bonuses. (*Id*. at ¶ 46).

Subsequent text communications on July 26, 2023, between Fredericks and Salkovitz, confirm that Fredericks authorized those representations concerning the retention bonus and, per

---

[5] Indeed, the Salkovitzes alleged in their Third-Party Complaint against Hilco that "… Hilco Merchant and ReStore took effective operational control, with final say over all material CTS operations, from the time the DIP financing was put in place, going so far as installing their own agents in CTS stores, or requiring reporting to such agents with respect to, the operations of all CTS stores, including regarding the hiring and/or firing of employees at the stores." D.N.J. Case No. 2:24-cv-05933, ECF No. 35 at 15, ¶ 30, a copy of which is attached hereto as **Exhibit B**.

[6] Specifically, Fredericks agreed that Additional Store associates employed for one year or more (as of the date of their respective store closing) who remained employed through their respective store closing would receive a retention bonus equal to one week of wages, Additional Store assistant managers who remained employed through their respective store closing date would be paid a retention bonus equal to two weeks of wages, and CTS Additional Store managers who remained employed through their respective store closing date would be paid a retention bonus equal to four weeks of wages. (*Id*. at ¶ 44).

3225153.1 118626-112745

Fredericks, "were always in [the] budget." (Adv. D.I. 71). Fredericks told Salkovitz that Hilco would be paying retention bonuses to all Additional Store employees who met eligibility criteria and asked for Salkovitz to have CTS send Hilco the information needed for Hilco's "team . . . to validate that people actually met criteria." (*Id*.) Upon information and belief, sometime thereafter, in or about late July or early August 2023, CTS provided Hilco with the retention bonus report referred to in Fredericks/Salkovitz text exchange. (Adv. D.I. 70, at ¶ 63).

Upon receipt of the retention bonus report, Hilco disclaimed responsibility to pay the retention bonuses, (*id*. at ¶ 64) and on August 12, 2023, Hilco Senior Vice President of Operations, Michael Dwyer ("Dwyer") contacted CTS Senior Vice President of Store Operations, Trace Hoyer ("Hoyer") and instructed Hoyer that all liquidation sales were ending and that all CTS employees were terminated effective immediately. (*Id*. at ¶ 65). As a result, the Massachusetts Subclass was not timely paid the wages they earned during their final pay period, their accrued and unused vacation, and retention bonuses (for store-level employees) on their final date of employment, and the Nationwide Subclass[7] was not paid their retention bonus. (*Id*. at ¶ 66).

On August 16, 2023, this Court held a hearing on CTS's motion to convert. (CH Transcript, Ex. A). There, Hilco's counsel effectively confirmed Hilco's responsibility to pay the retention bonuses. On multiple occasions, Hilco's counsel stated in relevant part:

> If they're in the budget, they're getting paid, the employees.

(*Id*. at 13:20-21)

> If it's in the budget and the reconciliation comes out that we didn't pay
> what's in the budget, we'll pay the amounts. That's an expense item.
> That's a number. We'll get it paid. I don't want to hurt the employees at
> all.

---

[7] The Amended Complaint defines the Nationwide Subclass as "all CTS store-level employees who were employed in any non-Massachusetts Additional Store through the final date of the liquidation sale at their respective store."

9

(*Id*. at 23:3-6).

Retention bonuses for Additional Store employees were in fact in the budget. On July 13, 2023, this Court entered a *Final Supplemental Order to the Final Order pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief* (the "Final Supplemental DIP Order") (Final Supplemental DIP Order, Bankr. 431). The Final Supplemental DIP Order approved the final supplemental DIP budget, which was agreed to by Hilco/ReStore and which expressly included a $599,000 line item for store level retention bonuses. (*Id*. at Exhibit 1). Despite retention bonuses being in the supplemental DIP budget and Hilco's counsel unambiguously stating that Hilco would pay all amounts in the budget, no CTS Additional Store employee has been paid a retention bonus to this day. (Adv. D.I. 70, at ¶ 66).[8] In addition to the unpaid retention bonuses, Massachusetts Subclass members were not timely paid

---

[8] In addition to assuring the Court that Hilco would pay all budgeted amounts, the following colloquy at the conversion hearing demonstrates that Hilco's counsel was unaware of the fact that no retention bonuses had been paid to Additional Store employees despite believing some had been:

| | |
|---|---|
| Mr. Gilardi: | The deal was they would be paid certain amounts and then in the final, after, as set forth in the budget, they would get the bonuses later. They've been paid the bonuses early, some of these people. |
| Unidentified Speaker: | No, they haven't. |
| Mr. Galardi: | Oh, they haven't been paid? I thought some were - - |
| The Court: | Okay, Mr. Fredericks - - |

(CH Transcript, Ex. A at 24:14-21).

3225153.1 118626-112745

the wages they earned during their final pay period or their accrued and unused vacation time.

(Adv. D.I. 70, at ¶ 66).[9]

# ARGUMENT[10]

I.   **Plaintiffs have stated a claim against Hilco for violation of the Massachusetts Wage Act, G.L. c. 149, § 148.**

   A.   **Plaintiffs have sufficiently alleged that Hilco was the joint employer of the Massachusetts Subclass.**

The Massachusetts Supreme Judicial Court ("SJC") has recognized that the

Massachusetts "wage laws . . . include th[e] long-standing concept of joint employment." *Jinks v.*

*Credico (USA) LLC*, 488 Mass. 691, 699 (2001). "'The basis of the [joint employment] finding is

simply that one employer while contracting in good faith with an otherwise independent

company, has retained for itself sufficient control of the terms and conditions of employment of

the employees who are employed by the other employer.'" *Id.* (citing *Swallows v. Barnes &*

*Noble Book Stores, Inc.*, 12 F.3d 990, 993 n. 4 (6th Cir. 1997), *quoting Nat'l Lab. Relations Bd.*

v. *Browning-Ferris Indus. Of Pa., Inc.*, 691 F.2d 1117, 1123 (3d Cir. 1982)).

"[W]hether an entity is a joint employer under the [Massachusetts] wage laws, which

were modeled after the FLSA should be determined (as is done under the FLSA) by examining

the totality of the circumstances of the parties' working relationship, guided by a useful

framework of four factors: 'whether the alleged employer (1) had the power to hire and fire the

employees; (2) supervised and controlled employee work schedules or conditions of

---

[9] All CTS Additional Store and corporate employees laid off on August 12, 2023, were not paid their final pay period wages and accrued and unused vacation time on the date of separation, but Plaintiffs only pursue claims related to this issue for Massachusetts Subclass members.

[10] Hilco's Motion properly articulates the Rule 12(b)(6) standard.

3225153.1 118626-112745

employment; (3) determine the rate and method of payment; and (4) maintained employment records." *Jinks*, 488 Mass. at 703 (citing *Baystate Alternative Staffing, Inc. v. Herman* 163 F.3d 668, 675 (1st Cir. 1998)). "No one factor is dispositive; instead, it is the totality of the circumstances that will determine whether an entity out to be considered a joint employer." *Id*. (citing *Baystate*, 163 F.3d at 676).

Here, accepting Plaintiffs' allegations as true, they have pleaded sufficient facts to state a claim that Hilco was the joint employer of the Massachusetts Subclass. Plaintiffs have alleged that Hilco: (1) determined which CTS employees would be retained and which would be terminated; (2) installed supervisors who oversaw and managed all CTS stores; (3) regularly provided instruction and direction to CTS corporate and store level employees; (4) managed and controlled CTS employee-relations matters; and (5) authorized the payment of retention bonuses. If each of the foregoing are true, a finding that Hilco was the joint employer of the Massachusetts Subclass would be warranted.

On the substantive joint employment question, Hilco says nothing. Instead, Hilco focuses its Motion on an irrelevant issue, erroneously citing inapposite Massachusetts case law analyzing individual corporate officer liability under the Massachusetts Wage Act, and paying no heed to the applicable case law governing joint employer liability. (Motion, Adv. D.I. 78 at 9-10). Plaintiffs are not seeking to hold any individual officer of Hilco liable. They are seeking to hold Hilco liable as the joint employer, which is recognized under the Massachusetts Wage Act, G.L. 149, § 148, and governed by the standard set forth in *Jinks*. Accepting Plaintiffs' allegation as true, as this Court must, Plaintiffs' Amended Complaint meets the *Jinks* joint employer standard.

**B. Plaintiffs have sufficiently alleged Hilco violated the Massachusetts Wage Act.**

12

If, as detailed above, Hilco was the joint employer of the Massachusetts Subclass, then it was required to comply with the Massachusetts Wage Act, G. L. c. 149, § 148. *See Tran v. Jenning Road Mgmt. Corp.*, 104 Mass.App.Ct. 276 (2024) (joint employer "liable for any violations of the [Massachusetts] wage laws that [employee] can prove.").

In that vein, failure to pay a terminated employee all wages due, including all accrued and unused vacation pay, **on the termination date**, is a violation of the Massachusetts Wage Act. *See Reuter v. City of Methuen*, 489 Mass. 465, 468 (2022) ("any employee discharged from such employment . . . shall be paid in full on the day of his discharge"; "a terminated employee is entitled to all accrued vacation benefits on the day of discharge."). An employer who fails to pay employees all wages due on the termination date, is liable for a mandatory award of treble damages. *See* G.L. c. 149, § 150 ("[a]n employee so aggrieved who prevails in such an action shall be awarded treble damages, as liquidated damages . . . ."); *see also Reuter*, 465 Mass. at 471 ("[t]he remedy is . . . explicit.").

Plaintiffs have stated a claim for Hilco's violation of the Wage Act. As the joint employer of the Massachusetts Subclass, Hilco failed to pay the Massachusetts Subclass the wages they earned during their final pay period, including their accrued and unused vacation time, on the date of their termination. (Adv. D.I. 70 at ¶ 66). This allegation is not just pleaded in the Amended Complaint; it is not disputed. Much of the August 16, 2023 conversion hearing, four days after all Massachusetts Subclass members were terminated, was dedicated to addressing how and when CTS employees would be paid their final wages. (CH Transcript, Ex. A at 23:20-22) (the Court stating, "[t]hese hourly employees, who I think we can all agree are not highly compensated and probably count on this money week-to-week, for them not to get paid is unacceptable."). Although the Massachusetts Subclass has since been paid their single amount of

13

final pay period wages and accrued vacation, Hilco is liable to them for the full panoply of remedies afforded by the Massachusetts Wage Act, including an award of treble damages.

The only argument Hilco makes in response is that retention bonuses are not covered by the Massachusetts Wage Act. Hilco's Motion cites Massachusetts cases to that effect, and Plaintiffs could cite to cases holding the opposite. Neither are here nor there. Whether a retention bonus is covered by the Massachusetts Wage Act is currently set to be decided by the SJC. (*See* Supreme Judicial Court docket sheet in *Nunez v. Syncsort Inc.*, SJC-13709, attached as **Exhibit C** at #2**)** (deciding the question of "[w]hether, once the plaintiff/employee met all conditions required to receive a retention bonus pursuant to an agreement with the defendant/employer, that bonus constitutes an earned wage for purposes of the Wage Act, G.L. c. 149, § 148.").[11] Whether or not retention bonuses are covered by the Wage Act, Plaintiffs have still adequately stated a claim as wages earned during the final pay period and vacation pay are wages covered by the Massachusetts Wage Act. The question of whether retention bonuses are also covered only goes to the scope of Hilco's Wage Act liability. This Court should defer answering this question until the SJC issues its decision in *Nunez*.

> **C. The provision in the Store Closing Agreement disclaiming liability for Hilco as an employer of CTS employees is a "Special Contract" in violation of the Massachusetts Wage Act and void as a matter of law.**

"The [Massachusetts] Wage Act proscribes 'special contracts' that exempt employers from its provisions." *Melia v. Zenhire, Inc.*, 462 Mass. 164, 170 (2012); *see also* G.L. c. 149, § 148 ("[n]o person shall by a special contract with an employee or by any other means exempt

---

[11] Oral argument before the SJC in *Nunez* took place on April 8, 2025. (*Id.*) A decision is imminent. *See* https://www.mass.gov/info-details/supreme-judicial-court-oral-arguments ("The justices issue written opinions (decisions) generally within 130 days following oral arguments.")

14

himself from this section or from section one hundred and fifty.").[12] "An agreement to circumvent the Wage Act is illegal even when 'the arrangement is voluntary and assented to.'" *Id*. (citing *Camara v. Attorney Gen.*, 458 Mass. 756, 760-61 (2011). The SJC has "consistently held that the legislative purpose behind the Wage Act (and especially the 'special contract' language) is to provide strong statutory protection for employees and their right to wages." *Crocker v. Townsend Oil Co, Inc.*, 464 Mass. 1, 13 (2012). Stated simply, the Wage Act prohibits employers from drafting contracts that allow them to disclaim Wage Act obligations. *Elec. Data Sys. Corp. v. Attorney General*, 454 Mass. 63, 70 (2009).

Here, Hilco asks this Court to do just that. The provision in the Store Closing Agreement disclaiming liability for Hilco and providing it with carte blanche exclusion from the requirements under the Massachusetts Wage Act is a special contract unenforceable as a matter of law. Although that provision itself is void, the Store Closing Agreement goes further. It couples Hilco's disclaimer as an employer with language allowing it to act as an employer, empowering Hilco to supervise, oversee, and manage CTS employees. Those provisions are textbook "special contracts" which attempt to contract around Wage Act liability and are unenforceable as a matter of law. Plaintiffs have alleged facts that support a claim against Hilco under the Massachusetts Wage Act, the Court should not countenance Hilco's attempt to contract around it.

> **D.  The Law of the Case Doctrine supports and authorizes this Court to reconsider and reject the provision in the Store Closing Order disclaiming liability for Hilco as a joint employer.**

---

[12] Section one hundred and fifty refers to G.L. c. 149, § 150, which is section that confers a private right of action to employees for violations of the Wage Act and prescribes the remedies for a violation of the Wage Act. *See* G.L c. 149, § 150 ("An employee claiming to be aggrieved by a violation of section[] . . . 148 . . . may . . . institute a prosecute in his own name and on his own behalf, or for himself and for others similarly situated, a civil action . . . for any damages incurred, and for any lost wages and other benefits . . . . An employee so aggrieved who prevails in such an action shall be awarded treble damages, as liquidated damages, for any lost wages and other benefits and shall also be awarded the costs of the litigation and reasonable attorneys' fees.").

15

"The law of the case doctrine provides that when a court actually decides a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *In re Phillps Services (Delaware), Inc.*, 267 B.R. 62, 66 (Bankr. D. Del. 2001). "However, that doctrine only applies to issues that were actually litigated and decided by the court." *Id*. (citing *Brown v. Flater*, 1996 WL 434192, at *2 (E.D. Pa. July 31, 1996) (law of case doctrine only applies to issues of law actually addressed on prior occasion). "[T]he law of the case doctrine does not act as an absolute bar on re-litigation (in contrast to the doctrines of claim and issue preclusion)." *Id*.

Here, neither the merits nor enforceability of the provision in the Store Closing Agreement disclaiming employer liability for Hilco was ever litigated. No putative class member was given notice of the Store Closing Motion. No putative class member was a signatory to the Store Closing Agreement. Nor did any other party raise these issues by objection to the Store Closing Agreement. The law of the case doctrine therefore does not bar reconsideration of the issue. What is more, courts in this district "are particularly hesitant to apply the law of the case to a determination made in the main bankruptcy case to an issue raised in an adversary proceeding between two parties, one of whom was not a contestant in the prior matter." 267 B.R. at 66. That is exactly the case here.

Moreover, "'[e]ven where the law of the case doctrine applies, it does not bar reconsideration of an issue in certain 'extraordinary circumstances,' including where there has been a change in the law or reconsideration is necessary to prevent clear error or injustice.'" *In re Broadstripe, LLC*, 435 B.R. 245, 255 n 37. (Bankr. D. Del. 2010) (quoting *Joy Global, Inc. v. Wis. Dep't of Workforce Dev. (In re Joy Global, Inc.)*, 381 B.R. 603, 612 (D. Del. 2007)). To that end, it is hard to conceive of a set of facts that would result in greater injustice than those at play

16

here if the Store Closing Agreement provision disclaiming liability for Hilco as an employer is not rejected.

In sum, Hilco's alter ego financial arm, ReStore[13] negotiated an agreement that required CTS to use Hilco as CTS's liquidating "consultant." Then, Hilco negotiated the Store Closing Agreement which allowed Hilco to act as an employer to CTS employees in every respect, including using CTS employees to sell Hilco product, while simultaneously disclaiming liability for Hilco as an employer. In addition to exercising the joint employer authority granted to it under the Store Closing Agreement, Hilco then induced Additional Store employees to continue working for its benefit by promising retention bonuses, only to subsequently pull the plug on the liquidation sales, terminate every CTS employee without notice and without pay, and dishonor its promise to pay retention bonuses. This Court's admonishment is <u>exactly</u> what Hilco seeks to accomplish: running the case "on the backs of employees." (CH Transcript, Ex. A at 25:12-12).

Accordingly, the Court should rule that the law of the case doctrine does not preclude the Court from revisiting the Store Closing Order, and that the provision in the Store Closing Agreement disclaiming liability for Hilco as an employer is void as a matter of law.[14] Such a ruling would place the parties exactly where they ought to be: focused squarely on litigating

---

[13] Plaintiffs have also alleged sufficient facts to demonstrate that Hilco and ReStore are a "single integrated enterprise" for purposes of Wage Act liability. *See Jiang v. Tokyo II Steak House, Inc*. 616 F. Supp. 3d 167, 178-79 (D. Mass. 2022) (acknowledging that the "opinions that have applied the integrated enterprise test to a FLSA claim are the better reasoned," and noting that the single integrated enterprise test examines the following factors "(1) whether the companies' operations are interrelated; (2) whether there is common management; (3) whether there is centralized control of labor operations; and (4) whether there is common ownership."). Plaintiffs have alleged that ReStore's Consignment Agreement with CTS required CTS to use Hilco as its liquidating "consultant," and that Hilco and ReStore are commonly owned and managed.

[14] Hilco also mentions that the Store Closing Order relieved CTS from complying with Fast Pay Laws, like the Massachusetts Wage Act. (Adv. D.I. 78 at 8). That provision is of no consequence because it did not relieve Hilco of complying with such laws, particularly where the Store Closing Order required Hilco to act as an independent consultant, (Store Closing Order, Bankr. D.I. 201 at 25, ¶ 48), and it did not, and where Hilco caused the liquidation sales to end and CTS employees to not be paid on termination. (Adv. D.I. 70 at ¶¶ 64-66).

17

whether Hilco's actual conduct rendered it the joint employer of the Massachusetts Subclass members.[15]

### E. The Provision of the Final Store Closing Order disclaiming liability for Hilco as an employer of CTS employees violates 28 U.S.C. § 959(b).

28 U.S.C. § 959(b) ("Section 959") prevented Hilco from conducting CTS' store closing liquidation sales in a manner inconsistent with valid state law, including the Massachusetts Wage Act. Section 959 provides in pertinent part:

> [A] trustee, receiver or *manager appointed in any cause pending in any court of the United States*, including a debtor in possession, *shall manage and operate* the property in his possession as such trustee, receiver or manager *according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof* (emphasis added).

28 U.S.C. § 959(b).

Section 959 requires a debtor in possession to comply "with all applicable state laws that regulate any aspect of carrying on a business." *In re PSA, Inc.*, 335 B.R. 580, 586 (Bankr. D. Del. 2005). Stated another way, Section 959 limits a "debtor's authority to conduct business in the ordinary course and engage in other transactions that are embodied in section 363." *In re White Crane Trading Co.*, 170 B.R. 694, 702 (Bankr. E.D. Cal. 1994). Section 959 has been on the books since 1887 and stands "for the uncontroversial proposition that a trustee [or a debtor in possession] must carry out his duties in conformity with state law." *Id. at 702* (citing *Hillis Motors, Inc. v. Hawaii Automobile Dealers' Ass'n*, 997 F.2d 581, 593 (9th Cir. 1993)). "Implicit in Section 959(b) is the notion that the goals of the federal bankruptcy laws, including

---

[15] Hilco says it would frustrate the purpose of the Bankruptcy Code to permit Plaintiffs to pursue their claims when the Court approved its consultancy role, but it does not actually explain why that is the case. If the facts demonstrate that Hilco **acted** purely as a "consultant," then it has nothing to worry about. There is no incompatibility between the Bankruptcy Code and requiring Hilco to act as a consultant. Hilco wants more. It wants to call itself a "consultant," be given the authority to act an employer, while simultaneously absolving itself of all liability as an employer. The Court should not countenance Hilco's thinly veiled attempt at accomplishing this untoward and unlawful goal.

rehabilitation of the debtor, do not authorize transgression of state laws setting the requirements for the operation of the business even if the continued operation of the business would be thwarted by applying state laws." *In re Quanta Resources Corp.*, 739 F.2d 912, 919 (3rd Cit. 1984). Section 959 applies "to debtors who continue to sell goods in the retail marketplace." *Id.*; *see also In re Wall Tube & Metal Products Co.*, 831 F.2d 118 (6th Cir. 1987); *cf. In re Campbell*, 13 B.R. 974 (Bankr. D. Idaho 1981); *In re Borne Chemical Co., Inc.*, 54 B.R. 126 (Bankr. D. N.J. 1984); *In re Scott Housing Systems, Inc.*, 91 B.R. 190 (Bankr. S.D. Ga. 1988).

*In re White Crane Trading Co., Inc.,* is directly on point and illustrative of Section 959's impact on a store closing order.  The case concerned a motion to revoke a store closing order that permitted a liquidating merchant to use advertising language deemed unfair and deceptive under California state law. Before addressing Section 959's impact on the store closing order, the court first explained how such an order comes before the court:

> The request for such an order ordinarily appears innocuous enough at first glance. It is billed as the debtor's best opportunity to raise capital to fund a chapter 11 plan. Creditors support it because there is a chance of more money for them. Nobody mentions the consumer protection issues or gives notice to enforcement authorities.

*In re White Crane Trading Co.*, 170 B.R. at 704.

The court then concluded that Section 959(b) required the liquidating merchant to conduct the store closing sales in full compliance with California state consumer protection laws, despite contrary language in the store closing order. *Id.*, 170 B.R. at 698. The court reasoned that the bankruptcy code does not "permit debtors or non-debtors to wrest competitive advantage by exempting themselves from the myriad of laws that regulate business." *Id.*, at 702. Through Section 959, Congress instead "required that every debtor in possession and bankruptcy trustee manage and operate the debtor's property and business in compliance with state laws – good, bad, and indifferent – that apply outside of bankruptcy." *Id.*

19

The court's decision in *In re White Crane Trading Co., Inc.,* is equally applicable here. The Final Store Closing Order was submitted to the Court as CTS's best chance to maximize the profitability of CTS's liquidation sales. CTS employees had no notice of the Final Store Closing Order prior to its approval and had no opportunity to raise any concerns about the applicability of the Massachusetts Wage Act. No legitimate goal of federal bankruptcy law is furthered by permitting Hilco, a non-debtor liquidating consultant, to use CTS's bankruptcy as a shield from liability under the Massachusetts Wage Act by contracting out of joint employer liability and then acting as an employer. The provisions of the Final Store Closing Order that Hilco claims shields it from liability are unenforceable under Section 959.

## II.     Plaintiffs have stated claims for intentional and negligent misrepresentation.

Contrary to Hilco's assertion otherwise, Plaintiffs' Amended Complaint adequately alleges the "what, when, where, and how" with respect to Hilco's promise to pay retention bonuses to Additional Store employees. The Amended Complaint alleges that following the Notice of Event of Default from the DIP Agent in or about late June/early July 2023, which in turn led to the inclusion of all Additional Stores in the ongoing liquidation sales, Fredericks represented to Salkovitz that Hilco/ReStore would fund retention bonuses for Additional Store employees. Plaintiffs specifically allege all of the particulars that Fredericks committed to on behalf of Hilco, including who would be entitled to a payment, the eligibility criteria for the payment, and the amount of the payment. *See supra* at n. 4.

Hilco's primary argument for dismissal is that it cannot be liable for misrepresentation because Plaintiffs do not allege that Hilco itself made any direct representation to the Plaintiffs or the putative class. Massachusetts courts, however, recognize a claim of indirect misrepresentation to third parties for "misrepresentation made by Defendant to such third parties

if the Defendant intended, or had reason to expect, that on repetition, the statement would influence Plaintiff's conduct to Plaintiff's detriment." *Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70, 86 (D. Mass. 1998) (citing *Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.,*, 577 F.Supp. 1281, 1287 (D. Mass 1983)). "[A] claim of indirect misrepresentation requires that 'the terms' of the alleged misrepresentation . . . 'be repeated,' or its 'substance communicated' . . . to the complaining party in order for an action to lie." *Id*.

Here, Plaintiffs have alleged exactly that; CTS communicated the retention bonus promised by Hilco to CTS employees, which Hilco reasonably expected to occur. CTS employees in turn relied on the promise to their detriment, by remaining employed through the end of their respective stores' closing sales after which they did not receive the retention bonus.

Hilco tries to discredit the July 26, 2023 text communications between Fredericks and Salkovitz by arguing that the text messages cannot serve as the basis for Plaintiffs' misrepresentation claims because the text messages occurred after the purported misrepresentations were made. Hilco's argument hardly merits a response other than to say the text messages speak for themselves. They provide written confirmation that Hilco was telling CTS that it both understood retention bonuses were in the budget and that it intended to pay retention bonuses to CTS employees who were eligible. In other words, Fredericks was, as alleged in the Amended Complaint, confirming Hilco's prior representations.

In sum, Plaintiffs have alleged all the elements of an intentional misrepresentation claim. Plaintiffs have alleged that Hilco, through CTS, made a statement that was knowingly false (i.e., that it would pay retention bonuses), that the representations by Hilco were made with the intent to deceive (i.e., that Hilco subsequently disclaimed responsibility to pay retention bonuses despite knowing Fredericks promised Hilco would pay them), that the statement was material to

21

the putative class's decision (i.e., putative class members believed they would receive additional compensation for remaining employed through the end of the liquidation sales), that the putative class reasonably relied on the statement (i.e., putative class members remained employed through the end of the liquidation sales because they believed they would receive extra compensation for doing so), and that putative class was injured as a result of their reliance (i.e., putative class members did not receive the retention bonus they reasonably believed they would receive in exchange for working through the liquidation sales).

Plaintiffs have also alleged all of the elements of a negligent misrepresentation claim. Plaintiffs have alleged that Hilco in the course of its business (i.e., Hilco in its dealings with CTS), supplied false information for the guidance of others (i.e., that Hilco would pay retention bonuses), causing and resulting in pecuniary loss to others by their justifiable reliance on the information (i.e., putative class members did not receive the retention bonus they reasonably believed they would receive in exchange for working through the liquidation sales), and that Hilco failed to exercise reasonable care or competence in obtaining or communicating the information (i.e., Hilco agreed to a budget containing retention bonus payments, acknowledged it would pay what was in the budget, and has still yet to make any retention bonus payments).

Accordingly, Hilco's motion on the misrepresentation claims should be denied.

## III.   Plaintiffs have stated a claim for unjust enrichment against Hilco.

"To succeed on an unjust enrichment claim, a plaintiff must establish that (1) it 'conferred a measurable benefit' on the defendant, (2) it 'reasonably expected compensation,' and (3) 'the defendant accepted the benefit with knowledge' of that reasonable expectation. *Tody's Service, Inc. v. Liberty Mutual Ins. Co.*, 496 Mass. 197, 200 (2025) (citing *Columbia Plaza Assocs. v. Northeastern Univ.*, 493 Mass. 570, 589 (2024).

22

Plaintiffs have alleged facts when viewed in conjunction with the Store Closing Motion that support each of these elements. In seeking approval for retention bonuses to Additional Store employees without further court approval, the Store Closing Motion speaks to the measurable benefit CTS employees afforded Hilco by working through the end of the liquidation sales. In relevant part, the Store Closing Motion notes that "payments . . . to Store Bonus Program participants [were] . . . to ensure successful consummation of the Closing Sales . . . [and to] maximize stakeholder value through the Closing Sales at a time when those employees' positions will soon be terminated." (Store Closing Motion, Bankr. D.I. 20 at 14, ¶¶ 17-18). Hilco was one such stakeholder, entitled to a percentage of all revenue generated during the closing sales. *See supra* at p. 5 (detailing compensation from store closing sales which Hilco was entitled to receive). This included Hilco using CTS employees to sell Hilco's own merchandise, for which Hilco received 93.5% of gross proceeds. (*Id*.).

Hilco argues that Plaintiffs' unjust enrichment claim fails because Plaintiffs do not allege that they reasonably expected compensation from Hilco, or that Hilco could have known of such an expectation. As to the former, Massachusetts law does not require Plaintiffs to explicitly demonstrate that they expected compensation from Hilco. *See Depianti v. Jan-Pro Franchising Intern., Inc.*, 39 F. Supp. 112, 142 (D. Mass. 2014) ("Depianti is not required to have had a reasonable expectation he would be compensated by JPI for his services."). "The elements of the more general action of unjust enrichment '[i]n Massachusetts . . . are 'unjust enrichment of one party and unjust detriment to the other party.''" *Id*. (quoting *Mass Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 234 n. 7 (1st Cir. 2005) (quoting *Bushkin Assocs., Inc. v. Raytheon Co.,* 996 F.2d 11, 15 (1st Cir. 1990))).

3225153.1 118626-112745

Here, more simply, Plaintiffs have set forth sufficient allegations supporting their assertion that CTS employees reasonably expected to be paid retention bonuses, and that Hilco accepted the benefit of CTS employees working through the end of the liquidation sales with the knowledge that CTS employees expected payment of the retention bonuses. (Adv. D.I. 70, at ¶¶ 45-48). Although those allegations alone are sufficient to state a claim for unjust enrichment, Hilco has outright acknowledged its responsibility to pay the outstanding retention bonuses. *See supra* at pp. 9-10 (describing Hilco's counsel acknowledgment that Hilco is prepared to pay all budgeted expenses, which included retention bonuses).

Hilco's final argument, that Plaintiffs cannot bring a claim for unjust enrichment because they have an adequate remedy at law is easily addressed. At the motion to dismiss phase, a plaintiff can plead a count for unjust enrichment in the alternative to any potential remedies at law. *See Durbeck v. Suffolk Univ.*, 547 F. Supp. 133, 149-50 (D. Mass 2021) (collecting cases).

**IV.    Alternatively, the Court may modify the Store Closing Order striking any provisions disclaiming liability for Hilco as a joint employer.**

In the event the Court considers a finding/ruling on the applicability of the Store Closing Order is procedurally necessary/proper in the context of this adversary proceeding, the Plaintiffs are prepared to bring a motion to that effect. However, Plaintiffs note that there is authority for the Court to find that main proceeding orders do not preclude conclusions in an adversary proceeding that may be different from a main proceeding order when the issue presented was not fully litigated and involves a new party. *See, e.g.*, *Phillip Services*, 267 B. R. at 68 (stating "we conclude that it is not appropriate to give res judicata effect to a cash collateral stipulation [entered in the main case] in a later adversary proceeding" when the subject issue was not fully litigated and the party raising the issue was not a party to the stipulation). For the reasons set

24

3225153.1 118626-112745

forth herein, the Court should exercise its discretion under the law of the case doctrine and strike

any provisions in the Store Closing Order disclaiming liability for Hilco as a joint employer.

## CONCLUSION

For the foregoing reasons, Hilco's motion to dismiss the Amended Complaint should be

**DENIED**.

Dated: July 18, 2025
Wilmington, Delaware

*/s/ Katharina Earle*                                                           -and –
Katharina Earle (No. 6348)
**GIBBONS P.C.**                                                            Adam J. Shafran (admitted *pro hac vice*)
300 Delaware Avenue, Suite 1015                  **RUDOLPH FRIEDMANN LLP**
Wilmington, Delaware 19801                           92 State Street
Telephone: (302) 518-6300                             Boston, MA 02109
Email: kearle@gibbonslaw.com                    Telephone: (617) 723-7700
                                                                        Email: ashafran@rflawyers.com
-and-


Robert K. Malone (*pro hac vice forthcoming*)
Mark B. Conlan (admitted *pro hac vice*)
Christopher P. Anton (*pro hac vice forthcoming*)
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
Telephone: (973) 596-4500
Email: rmalone@gibbonslaw.com
        mconlan@gibbonslaw.com
        canton@gibbonslaw.com


*Co-Counsel for Attorneys for Christopher Corbin and Rich Seronick,*
*Individually and on behalf of all others similarly situated*

25

3225153.1 118626-112745