**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| CHRISTMAS TREE SHOPS, LLC, <u>et</u> <u>al.</u>,[1] | Case No. 23-10576 (TMH) |
| Debtors. | (Jointly Administered) |
| CHRISTOPHER CORBIN and RICH SERONICK Individually, and on behalf of all others similarly situated, | Adv. Pro. No. 25-50003 (TMH) |
| Plaintiffs, | |
| v. | |
| HILCO MERCHANT RESOURCES, LLC, | |
| Defendant. | |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

Christmas Tree Shops ("CTS"), a New England retail chain, entered chapter 11 in May 2023 and within months collapsed into liquidation. The workers who stayed to sell off its inventory were not paid their final wages and vacation pay when Massachusetts law required, and they never received the retention bonuses they alleged had been promised for remaining until their stores closed. This adversary proceeding asks whether Hilco Merchant Resources, LLC ("Hilco"), the

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number are as follows: Christmas Tree Shops, LLC (1207), Handil, LLC (1150), Handil Holdings, LLC (2891), Salkovitz Family Trust 2, LLC (8773), and Nantucket Distributing Co., LLC (1640).

firm CTS hired to run the going-out-of-business sales, must answer for those amounts, or whether language in this Court's Store Closing Order immunizes it.

The Plaintiffs, Christopher Corbin and Rich Seronick, sue individually and behalf of putative classes of Massachusetts and nationwide workers. They allege that Hilco did far more than consult. They allege that Hilco helped decide which employees CTS retained and which it fired, installed supervisors to run the stores, directed the timing of the closings, and on August 12, 2023, ordered every remaining CTS employee terminated effective immediately. Ian Fredericks, who led both Hilco and its affiliated lender ReStore Capital, promised CTS that Hilco would fund retention bonuses for workers who stayed through the final day of sales, a promise CTS relayed to its employees. The workers stayed. Hilco took 92.5 percent of the proceeds from the merchandise they sold, then refused to fund the bonuses. On these allegations the Plaintiffs bring claims under the Massachusetts Wage Act and for intentional misrepresentation, negligent misrepresentation, and unjust enrichment.

Hilco has filed its Motion to Dismiss the First Amended Class Action Complaint under Federal Rule of Civil Procedure 12(b)(6), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012.

Hilco's defense rests primarily on the documents it negotiated. The Store Closing Agreement and paragraph 48 of the Store Closing Order state that Hilco acted "solely as an independent consultant" and "shall not be deemed to be an employer . . . for any purpose whatsoever." Hilco reads that language as a complete

2

bar to every claim. The order itself forecloses that reading. The same order preserves "laws of general applicability, including . . . labor [and] employment . . . laws," and extends Hilco's protection only if Hilco acted solely as a consultant. The Wage Act forbids an employer from exempting itself from the statute "by a special contract . . . or by any other means." An order entered under certification of counsel and without a hearing is not dispositive, at this stage, of wage claims asserted by employees who were not parties to the Store Closing Motion and did not litigate the enforceability of the employer-disclaimer provision.

For the reasons that follow, the Court grants the motion in part and denies it in part.

## II.     JURISDICTION & VENUE

This action involves claims under common law and Massachusetts statutory law. The Court has "related to" jurisdiction under 28 U.S.C. § 1334(b) over this adversary proceeding because the outcome could affect the estate, including through Hilco's indemnity rights under the Store Closing Agreement. To the extent deciding the Motion to Dismiss requires the Court to interpret its own Store Closing Order, the proceeding is also within the district court's "arising in" jurisdiction under section 1334(b).[2] The United States District Court for the District of Delaware has referred this proceeding to this Court under its Amended Standing Order of

---

[2] See Travelers Indem. Co. v. Bailey, 557 U.S. 137, 151 (2009) (a bankruptcy court has authority to interpret and enforce its own orders).

3

Reference, dated February 29, 2012.[3] Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## III.    FACTUAL BACKGROUND[4]

The Plaintiffs are Massachusetts residents who worked for Christmas Tree Shops, LLC. Mr. Corbin was Vice President of Enterprise Systems in CTS's Middleborough, Massachusetts office. Mr. Seronick was a store-level associate in CTS's Foxborough, Massachusetts store.[5]

On January 6, 2023, CTS and ReStore Capital, LLC ("ReStore") entered into their Agreement for Consignment of Memo Merchandise (the "Consignment Agreement").[6] Paragraph 32 required CTS to "engage the exclusive services of Hilco . . . to oversee, assist with, and otherwise conduct such Liquidation Sale(s)" in the event CTS elected to conduct a "going-out-of-business" or similar liquidation sale.[7] Ian Fredericks was President of both Hilco and ReStore at all relevant times.[8]

CTS and its affiliated debtors filed chapter 11 petitions on May 5, 2023.[9] On May 7, 2023, the Debtors filed an Emergency Motion for Interim and Final Orders

---

[3] 28 U.S.C. § 157(a).

[4] For the purposes of this opinion, the Court accepts the Plaintiffs' well-pleaded allegations to be true.

[5] Complaint ¶¶ 6–7.

[6] Id. ¶ 12.

[7] Id. ¶ 14; Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Assumption of Consignment Agreement, as Amended, (II) Fixing Cure Amount in Connection Therewith, (III) Finding That the Arrangement Under the Consignment Agreement Is a True Consignment or, in the Alternative, Granting ReStore a Senior Postpetition Lien and (IV) Granting Related Relief [Bankr. D.I. 24] at Ex. A, ¶ 32.

[8] Complaint ¶ 13.

[9] Id. ¶ 15.

(I)(A) Confirming, on an Interim Basis, that the Store Closing Agreement is Operative and Effective and (B) Authorizing, on a Final Basis, the Debtors to Assume the Store Closing Agreement, (II) Authorizing and Approving Closing Sales Free and Clear of All Liens, Claims, and Encumbrances and (III) Granting Related Relief (the "Store Closing Motion") [D.I. 20].[10]

Attached to the Store Closing Motion was a Store Closing Agreement between CTS and Hilco, dated May 5, 2023, under which CTS engaged Hilco to serve as a "consultant" to provide services to CTS in connection with its going-out-of-business sales.[11] The services included the closing of the ten Initial Stores and the potential closing of the 72 remaining CTS stores (the "Additional Stores").[12]

Paragraph C(i) of the Store Closing Agreement provided:

The Parties expressly acknowledge and agree that Merchant shall have no liability to the Supervisors for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of termination or any other liability arising from Agent's hiring or engagement of the Supervisors, and the Supervisors shall not be considered employees of Merchant.

Paragraph N of the Store Closing Agreement provided:

### N.    Independent Consultant[13]

Agent's relationship to Merchant is that of an independent contractor without the capacity to bind Merchant in any respect. No employer/employee, principal/agent, joint venture or other such relationship is created by this Agreement. Merchant shall have no control over the hours that Agent or its employees or assistants or the Supervisors work or the means or manner in which the services that

---

[10] Id. ¶ 25.
[11] Complaint ¶ 18; Store Closing Mot. Ex. A.
[12] Complaint ¶ 18.
[13] For the purposes of the Store Closing Agreement, Hilco is the Agent and CTS is the Merchant.

will be provided are performed and Agent is not authorized to enter into any contracts or agreements on behalf of Merchant or to otherwise create any obligations of Merchant to third parties, unless authorized in writing to do so by Merchant.[14]

This paragraph frames Hilco's contractual status as an independent consultant in relation to CTS and its employees.

Through the Store Closing Motion, the Debtors also sought approval for payment of retention bonuses to CTS store-level employees of the Initial Stores in an aggregate amount up to $162,230.[15] The Debtors also sought approval for the possible payment of retention bonuses to CTS store-level employees in any Additional Stores with the consent of the DIP lenders and Prepetition Agent.[16] On May 20, 2023, the Official Committee of Unsecured Creditors filed an objection to the Store Closing Motion.[17] The parties resolved the objection.

On May 31, 2023, this Court entered, under certification of counsel and without a hearing,[18] the Order (I) Authorizing, on a Final Basis, the Debtors to Assume the Store Closing Agreement, (II) Authorizing and Approving Closing Sales Free and Clear of All Liens, Claims, and Encumbrances, and (III) Granting Related Relief (the "Store Closing Order") [Bankr. D.I. 201].[19] Paragraph 48 of the Store

---

[14] Store Closing Agreement ¶ N.
[15] Complaint ¶ 26.
[16] Id. ¶ 28.
[17] Bankr. D.I. 155 ¶¶ 27, 30, 34–35.
[18] Complaint ¶ 32; Certification of Counsel Regarding Final Order with Respect to Debtors' Emergency Motion for Interim and Final Orders (I)(A) Confirming, on an Interim Basis, That the Store Closing Agreement Is Operative and Effective and (B) Authorizing, on a Final Basis, the Debtors to Assume the Store Closing Agreement, (II) Authorizing and Approving Closing Sales Free and Clear of All Liens, Claims, and Encumbrances, and (III) Granting Related Relief [Bankr. D.I. 196].
[19] Complaint ¶ 32.

Closing Order echoes the language of Paragraph N of the Store Closing Agreement and provides:

> [Hilco] shall act solely as an independent consultant to the Debtors and shall not be liable for any claims against the Debtors other than as expressly provided in the Store Closing Agreement (including [Hilco's] indemnity obligations thereunder) or the Sale Guidelines, with the exception of acts of fraud, willful misconduct, or gross negligence, and with the exception of breach of the Store Closing Agreement by [Hilco], and, for greater certainty, [Hilco] shall not be deemed to be an employer, a joint or successor employer, or a related or common employer or payor within the meaning of any legislation governing employment or labor standards, health and safety, or other statute, regulation, or rule of law or equity for any purpose whatsoever, and shall not incur any successor liability whatsoever.[20]

Paragraphs 32 and 48 must be read together. Paragraph 32 provides "[e]xcept as otherwise set forth herein, the Closing Sales shall not be exempt from laws of general applicability, including, without limitation, labor [and] employment . . . laws . . . .[21]

Paragraph B of the Store Closing Order contains a finding that the Store Closing Agreement "was negotiated, proposed, and entered into without collusion, in good faith, and from arm's length bargaining positions."[22]

The Store Closing Order also provides that Hilco was permitted to supplement store inventory with goods owned by Hilco (the "Additional Consultant Goods") and that Hilco would receive 92.5% of the gross proceeds of such goods.[23]

---

[20] Store Closing Order ¶ 48; Complaint ¶ 33.
[21] Store Closing Order ¶ 32.
[22] Id. ¶ B.
[23] Complaint ¶ 19(g), 20; Store Closing Order ¶¶ 11–14.

On or about June 21, 2023, the DIP Agent issued a Notice of Event of Default.[24] Around that time, Hilco requested and received an employee roster from CTS's human resources department.[25] Hilco and CTS jointly determined which employees would be retained and which would be terminated.[26] Mr. Fredericks and Marc Salkovitz, the Executive Chairman of CTS, agreed that store-level employees who remained employed through their respective store's final date of operation would receive retention bonuses ranging from one week's wages for associates to four weeks' wages for store managers.[27] Mr. Fredericks specifically represented that Hilco/ReStore would provide the funding.[28] The Final Supplemental DIP Order[29] that was entered on July 13, 2023 included a $599,000 budget line item for "store level bonuses."[30]

---

[24] Complaint ¶ 39.

[25] Id. ¶ 41.

[26] Id. ¶ 41.

[27] Id. ¶¶ 42–44. The associates in the remaining stores who were employed for one year or more (as of the date of their respective store closing) and who remained employed through their respective store closing date would be paid a retention bonus equal to one week of wages. Assistant store managers who remained employed through their respective store closing date would be paid a retention bonus equal to two weeks of wages, and store managers who remained employed through their respective store closing date would be paid a retention bonus equal to four weeks of wages.

[28] Id. ¶ 43.

[29] Final Supplemental Order to the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use of Cash Collateral; (IV) Modifying the Automatic Stay; and (V) Granting Related Relief [Bankr. D.I. 431].

[30] Id. Ex. 1.

On July 26, 2023, Mr. Fredericks confirmed in a text message exchange with Mr. Salkovitz that the bonuses "were always in budget for the payroll after" and that he "would handle [it] one way or another" (the "July 26 Text Messages").[31] Mr. Fredericks then directed that bonus eligibility be validated by Hilco employees reporting to Hilco Senior Vice President of Operations Michael Dwyer before any payments were processed.[32] After receiving the retention bonus report, Hilco disclaimed responsibility to pay.[33]

On August 10, 2023, the Debtors filed a motion to convert the cases to chapter 7.[34]

At approximately 6:00 p.m. ET on August 12, 2023, Mr. Dwyer contacted CTS Senior Vice President of Store Operations Trace Hoyer. Mr. Dwyer instructed Mr. Hoyer that all liquidation sales were ending and that all CTS employees were to be terminated effective immediately.[35]

On August 16, 2023, this Court entered its Order (I) Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code Pursuant to 11

---

[31] Complaint ¶¶ 49, 53; Plaintiff's Objection to Defendant Hilco Merchant Resources, LLCs Motion to Dismiss Plaintiffs' Amended Complaint (the "Pl. Obj."), Ex. A [Adv. D.I. 84].

[32] Complaint ¶¶ 56–59.

[33] Id. ¶ 64.

[34] Debtors' Motion for Entry of an Order (I) Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code Pursuant to 11 U.S.C. § 1112(b); (II) Approving the Conversion Procedures; (III) Authorizing the Transfer of the Professional Fee Funding Amount into a Segregated Attorney Trust Account Maintained by Debtors' Counsel; (IV) Limiting Notice of the Motion and (V) Granting Related Relief [Bankr. D.I. 506].

[35] Complaint ¶ 65.

U.S.C. § 1112(b); (II) Approving the Conversion Procedures; (III) Authorizing the Transfer of the Professional Fee Funding Amount into a Segregated Attorney Trust Account Maintained by Debtors' Counsel; (IV) Limiting Notice of the Motion and (V) Granting Related Relief.[36]

## IV.    PROCEDURAL HISTORY

On September 25, 2023, the Plaintiffs filed a complaint in the Superior Court of Plymouth County in the Commonwealth of Massachusetts, naming Hilco as a defendant along with Marc and Pam Salkovitz. The procedural background is extensive. It suffices to note that on January 9, 2025, this proceeding was transferred to this Court.[37]

On May 1, 2025, the Plaintiffs filed the Complaint in this adversary proceeding. On June 13, 2025, Hilco filed the Motion to Dismiss under Rule 12(b)(6).[38]

On December 4, 2025, the Court issued a letter opinion abstaining under 28 U.S.C. § 1334(c)(1).[39] On December 17, 2025, Hilco filed a Motion to Amend Findings, Alter or Amend Judgment, and/or for Relief from Order.[40] On May 27, 2026, the Court granted Hilco's motion to amend judgment and vacated the

---

[36] Bankr. D.I. 545.

[37] For a detailed discussion of the events that led to this proceeding coming to this Court, see Corbin v. Hilco Merchant Resources, LLC, Adv. Pro. No. 25-50003 (TMH), 2025 WL 3491701, *2–3 (Bankr. D. Del. Dec. 4, 2025).

[38] Fed. R. Bankr. P. 7012.

[39] Adv. D.I. 93.

[40] Adv. D.I. 94.

December 4 abstention order.[41] This is the Court's decision on the Motion to Dismiss.

## V.    PARTIES' POSITIONS

### A. Plaintiffs

The Plaintiffs, individually and as class representatives, assert claims on behalf of two subclasses. First, they define the Massachusetts Subclass as "all Massachusetts-based CTS employees who were either employed, as of August 12, 2023, in CTS's Massachusetts corporate office, or in any Additional Store located in Massachusetts."[42] Second, they define the Nationwide Subclass as "all CTS store-level employees who were employed in any non-Massachusetts Additional Stores through the final date of the liquidation sale at their respective store."[43]

For Count 1, violation of the Massachusetts Wage Act on behalf of the Massachusetts Subclass, the Plaintiffs allege that Hilco was a joint employer and that as a joint employer, Hilco violated Massachusetts General Laws ch. 149, § 148 by failing to timely pay (i) wages earned during the final pay period; (ii) accrued and unused vacation time due on the final day of employment; and (iii) retention bonuses for employees who worked through the end of their respective store's liquidation sale.[44] They seek treble damages, attorneys' fees, and prejudgment interest.[45] The Plaintiffs further allege that the Store Closing Agreement

---

[41] Adv. D.I. 111.
[42] Complaint ¶ 68.
[43] Id. ¶ 68.
[44] Id. ¶¶ 1(a), 66, 77–79.
[45] Id. ¶ 79.

"purported to limit Hilco's liability to CTS employees by including provisions pursuant to which Hilco could not be deemed an employer of CTS employees or liable to CTS employees for wages and/or remuneration without regard to Hilco's actual conduct" and that such employer-disclaimer provisions constitute void "special contracts" under section 148.[46] These provisions were incorporated into the Store Closing Order by the language at paragraph 48.

For Count 2, Intentional Misrepresentation on behalf of the Massachusetts Subclass store-level employees and the Nationwide Subclass, the Plaintiffs allege that Mr. Fredericks, on behalf of Hilco, represented to CTS that Hilco/ReStore intended to fund retention bonuses to Additional Store store-level employees who remained employed through the end of their store's liquidation sale. The Plaintiffs allege the representation was false because (i) Hilco never intended to fund the bonuses, (ii) Hilco made the representation knowing CTS would transmit it to employees, and (iii) employees relied on the promise and remained in their employment to their detriment.[47] Specifically, the Plaintiffs assert the element of scienter by alleging that "[a]t the time [Mr. Fredericks] agreed that Hilco/ReStore would provide funding for the retention bonuses, he either knew or should have known that Hilco/ReStore never intended to actually fund the retention bonus payments given CTS's default on the Loan Agreement and how poorly the liquidation sales were going."[48]

---

[46] Id. ¶¶ 23–24; Final Store Closing Order ¶ 48.

[47] Complaint ¶¶ 81–86.

[48] Id. ¶ 47.

12

For Count 3, Negligent Misrepresentation on behalf of the Massachusetts Subclass store-level employees and Nationwide Subclass, the Plaintiffs plead in the alternative to Count 2, on the same factual predicate, substituting a negligence standard, alleging that Hilco "failed to exercise reasonable care or competence in making the foregoing representations."[49]

Count 4 is for Unjust Enrichment on behalf of the Massachusetts Subclass store-level employees and Nationwide Subclass. The Plaintiffs allege that store-level employees who worked through their stores' final liquidation sales conferred a measurable benefit on Hilco, that Hilco accepted the benefit, and that Hilco's retention of the benefit without payment would be inequitable.[50] This claim is independently grounded in the Store Closing Order's authorization for Hilco to sell the Additional Consultant Goods in the CTS stores.[51]

### B. Defendant

Hilco argues that the Final Store Closing Order and Store Closing Agreement bar the Amended Complaint because those documents provide that Hilco acted solely as an independent consultant and "shall not be deemed to be an employer, a joint or successor employer, or a related or common employer or payor," and because the Store Closing Agreement further provides that Hilco has no liability to CTS employees for wages, benefits, severance, termination pay, vacation pay, or other liabilities arising from CTS's employment relationship.

---

[49] Id. ¶¶ 87–93.
[50] Id. ¶¶ 95–97.
[51] Id. ¶¶ 19(g), 20; Store Closing Order ¶¶ 11–14.

13

Hilco also argues that the intentional and negligent misrepresentation claims fail because the Plaintiffs do not allege any statement by Hilco to them, do not plead the alleged misrepresentation with Rule 9(b) particularity, do not identify any statement supporting reasonable reliance, and fail, in Hilco's view, to plead facts supporting fraudulent intent. As to negligent misrepresentation specifically, Hilco argues the alleged statement that "Hilco/ReStore intended to pay retention bonuses" is, at most, a non-actionable promise of future conduct.

Finally, Hilco argues that the unjust enrichment claim must be dismissed because the Complaint does not plausibly allege that the Plaintiffs conferred a measurable benefit on Hilco, does not allege that the Plaintiffs reasonably expected compensation from Hilco, and is barred by adequate legal remedies, including claims against CTS in the bankruptcy process.

## VI.   ANALYSIS

Under Rule 12(b)(6) a complaint will be dismissed when it fails "to state a claim upon which relief can be granted."[52] When considering a motion to dismiss under Rule 12(b)(6), the Court will "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and must determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[53] The Supreme Court has held that a pleading must nudge claims

---

[52] Fed. R. Civ. P. 12(b)(6).
[53] Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A., 879 F.3d 79, 83 n.6 (3d Cir. 2018).

14

"across the line from conceivable to plausible."[54] "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[55] This requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."[56] The determination is a context-specific task, drawing on the reviewing court's judicial experience and common sense.[57] The court is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation."[58]

The Third Circuit has articulated a three-part analysis to determine whether a complaint will survive a motion to dismiss under Rule 12(b)(6). This three-prong approach requires: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations and then (3) looking at the well-pleaded components of the complaint and evaluating whether all the elements identified in part one of the inquiry are sufficiently alleged."[59]

### A. Hilco's Status as a Joint Employer

Hilco's primary argument is that the Store Closing Agreement and paragraph 48 of the Store Closing Order preclude all claims by declaring Hilco "shall not be

---

[54] Ashcroft v. Iqbal, 556 U.S. 662, 680 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

[55] Santiago v. Warminster Twp., 629 F.3d 121, 128 (3d Cir. 2010).

[56] Ashcroft v. Iqbal, 556 U.S. at 678.

[57] Tabachnik v. Catterton Mgmt. Co., L.L.C. (In re Worth Collection, Ltd.), Adv. Pro. No. 23-50315 (BLS), 2026 Bankr. LEXIS 442, at *4–5 (Bankr. D. Del. Feb. 24, 2026).

[58] Chavarriaga v. New Jersey Dep't of Corr., 806 F.3d 210, 218–19 (3d Cir. 2015).

[59] Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

deemed to be an employer . . . within the meaning of any legislation governing employment or labor standards . . . for any purpose whatsoever."[60] The analysis is more nuanced than Hilco suggests.

### i. Hilco's Alleged Conduct Exceeds Paragraph 48's Consultant Limitation

First, the Store Closing Order contains a carve-out that the Complaint invokes.[61] Paragraph 48 of the Store Closing Order provides that Hilco "shall act solely as an independent consultant."[62] Therefore, the protection applies if Hilco acted only as an independent consultant. The Complaint alleges that Hilco's actual conduct violated this condition in a material respect "as its actual conduct demonstrates it did not act solely as an independent consultant."[63]

For example, accepting the well-pleaded allegations in the Complaint as true, the Plaintiffs allege that Hilco "determined, together with CTS, staffing requirements for CTS stores (i.e., determined who should be retained and who should be terminated)[;]"[64] that Hilco "requested and received an employee roster from CTS's human resources department, and jointly with CTS, determined which corporate and store-level employees would be terminated[;]"[65] that at approximately 6:00 p.m. on August 12, 2023, Dwyer, Hilco's Senior Vice President of Operations,

---

[60] Memorandum of Law in Support of Defendant Hilco Merchant Resources, LLC's Motion to Dismiss Plaintiffs' Amended Complaint (the "Hilco Mem. of Law") [Adv. D.I. 78] at 7–8 (quoting Store Closing Order ¶ 48).
[61] Complaint ¶ 33.
[62] Store Closing Order ¶ 48.
[63] Complaint ¶ 34.
[64] Id. ¶ 38.
[65] Id. ¶ 41.

"contacted CTS Senior Vice President of Store Operations Trace Hoyer ('Hoyer') and instructed Hoyer that all liquidation sales were ending and that all Christmas Tree Shop employees were to be terminated effective immediately[;]"[66] that Hilco "installed supervisors to oversee and manage CTS stores, . . . regularly provided instruction and direction to CTS corporate and store level employees, and managed and controlled employee-relations matters[;]"[67] that the closing sales depended on store-level employees continuing their duties "under the supervision of the Consultant [Hilco] and Debtors [CTS] [;]"[68] that Hilco "exercised at least an equivalent level of control over CTS and all CTS employees through Hilco's exercise of its authorized powers under the Store Closing Agreement and financial control through ReStore Capital[;]"[69] that "[i]n practice . . . Hilco exercised the authority granted to it under the Store Closing Agreement over the Massachusetts Subclass and the Nationwide Subclass[;]"[70] that the retention bonus amounts for the Initial Stores "was jointly determined by CTS and Hilco[;]"[71] that Fredericks, "on behalf of Hilco and ReStore," and Mr. Salkovitz "discussed and agreed that CTS store-level employees . . . who stayed on through their respective store's final date of operation, would be paid a retention bonus[;]"[72] that "Fredericks specifically represented to M. Salkovitz that Hilco/ReStore would provide the funding for the retention

---

[66] Id. ¶ 65.
[67] Id. ¶ 38.
[68] Id. ¶ 30.
[69] Id. ¶ 37.
[70] Id. ¶ 22.
[71] Id. ¶ 27.
[72] Id. ¶ 42.

bonuses[;]"[73] that Mr. Fredericks and Mr. Salkovitz "more specifically agreed" on the precise bonus tiers, one week of wages for associates, two weeks for assistant store managers, and four weeks for store managers[;][74] that "Fredericks specifically authorized payment of retention bonuses set forth in paragraph 44[;]"[75] that on July 26, 2023, Mr. Fredericks texted "[b]efore you put anything in payroll, our team needs to validate that people actually met criteria. So, you should coordinate with Koos or Sheri/Gary. We aren't paying for people who didn't meet criteria[;]"[76] and that "Hilco, in collaboration with CTS, oversaw and determined eligibility for retention bonus payments."[77]

Therefore, accepting the well-pleaded allegations in the Complaint as true for the purposes of the Motion to Dismiss, Hilco acted outside the scope of paragraph 48's provision that it "act solely as an independent consultant."

### ii.    Paragraph 32 Preserves the Wage Act, and Section C(i) Does Not Avoid It

Second, paragraph 32 of the Store Closing Order expressly preserves "laws of general applicability, including, without limitation . . . labor, employment . . . laws."[78] Hilco argues that section C(i) of the Store Closing Agreement bars the Wage Act claim. That section provides that:

> The Parties expressly acknowledge and agree that Agent [Hilco] shall have no liability to Merchant's [CTS's] employees for wages, benefits, severance pay, termination pay, vacation pay, pay in lieu of notice of

---

[73] Id. ¶ 43.
[74] Id. ¶ 44.
[75] Id. ¶ 46.
[76] Id. ¶ 56.
[77] Id. ¶ 60.
[78] Id. ¶ 32.

18

termination or any other liability arising from Merchant's employment, hiring or retention of its employees, and such employees shall not be considered employees of Agent.[79]

However, the Wage Act is a law of general applicability governing labor and employment. These two provisions must be read in harmony.

Section C(i) functions as an attempt to circumvent section 148 of the Wage Act, which provides:

> Every person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week . . . No person shall by a special contract with an employee or by any other means exempt himself from this section . . . .[80]

Hilco argues that section 148 is inapplicable here because the Store Closing Agreement is not a "contract with an employee." That is true, but it does not resolve the issue because Hilco fails to grapple with the subsequent language of the statute that an employer "by no other means may exempt himself from" section 148.

The Supreme Judicial Court of Massachusetts consistently has held that the "legislative purpose behind the Wage Act (and especially the 'special contract' language) is to provide strong statutory protection for employees and their right to wages."[81] "An agreement to circumvent the Wage Act is illegal even when 'the arrangement is voluntary and assented to.'"[82] Section C(i) is an attempt by "any

---

[79] Store Closing Agreement § C(i).
[80] MASS. GEN. LAWS ch. 149, § 148 (emphasis added).
[81] Crocker v. Townsend Oil Co., 464 Mass. 1, 13 (2012).
[82] Melia v. Zenhire, Inc., 462 Mass. 164, 170 (quoting Camara v. Att'y Gen., 458 Mass. 756, 760–61 (2011)).

19

other means" to avoid the protections Massachusetts affords workers under section 148. Hilco cannot circumvent section 148 by agreement with CTS.

Hilco additionally argues that the Store Closing Order relieved the parties of any responsibility under any Fast Pay Laws. Paragraph 49 of the Store Closing Order provides:

> The *Debtors* shall not be required to comply with any state or local law requiring that the *Debtors* pay an employee substantially contemporaneously with his or her termination, including but not limited to Fast Pay Laws; *provided, however*, that the *Debtors* shall pay any accrued wages to terminated employees as expeditiously as possible.[83]

By its express terms, this provision applies to the Debtors only. It does not apply to Hilco.

### iii.    Law of the Case Does Not Make Paragraph 48 Dispositive

Third, Hilco's reliance on the law of the case doctrine is misplaced. The law of the case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case.[84] The doctrine applies to issues actually litigated and decided.[85] In this matter, the Committee's objection was resolved by negotiation, and the Debtors submitted the final order under certification of counsel.[86] The Court did not hold a hearing on the Store Closing Order. No CTS employee was a party to the Store Closing Motion or was given notice of its terms. The Debtors did not litigate the

---

[83] Store Closing Order ¶ 49 (emphasis added).
[84] <u>Musacchio v. United States</u>, 577 U.S. 237, 244–45 (2016).
[85] <u>In re Philip Servs.</u>, 267 B.R. 62, 66 (Bankr. D. Del. 2001).
[86] Bankr. D.I. 196.

merits and enforceability of the employer-disclaimer provision in connection with the Store Closing Motion. Because the Court never has ruled on this specific issue, the law of the case doctrine does not apply.

Moreover, courts in this district are "particularly hesitant to apply the law of the case doctrine to a determination made in the main bankruptcy case to an issue raised in an adversary proceeding between two parties, one of whom was not a contestant in the prior matter."[87] Such is the case here.

As to paragraph B's finding that the Store Closing Agreement "was negotiated, proposed, and entered into without collusion, in good faith, and from arm's length bargaining positions," that finding speaks to the negotiation of the Store Closing Agreement.[88] It is not a finding that Hilco acted as an independent consultant after the Store Closing Agreement was executed, or that the disclaimer is enforceable against employees who were not parties.[89]

For these reasons, paragraph 48 of the Store Closing Order does not foreclose the Plaintiffs' claims.

### B. Count 1: The Wage Act

#### i. Wages & Vacation Pay

The Wage Act imposes liability on a corporation and individuals who meet specified criteria.[90] To prevail on a Wage Act claim, a plaintiff must establish that

---

[87] In re Philip Servs., 267 B.R. at 67.
[88] Store Closing Order ¶ B.
[89] Id.
[90] Segal v. Genitrix, LLC, 478 Mass. 551, 558 (2017).

(i) they were an employee under the Wage Act; (ii) the compensation constitutes wages pursuant to the Wage Act; (iii) the Wage Act was violated; and (iv) any individual defendants were corporate officers as defined by the statute.[91]

Under Massachusetts General Laws ch. 149, § 148, "[t]he president and treasurer of a corporation and any officers or agents having the management of such corporation shall be deemed to be the employers of the employees of the corporation within the meaning of this section."[92] Hilco relies on this language, arguing it should not be considered a statutory employer because it is not the president, treasurer, or an officer involved in the management of CTS.[93]

However, the Complaint does not seek to hold Hilco individually liable as a corporate officer. Rather, it seeks to hold Hilco liable as a joint employer under the doctrine recognized in Jinks v. Credico.[94] Under Jinks, joint employer status turns on whether an entity "retained for itself sufficient control over the terms and conditions of employment" of the employees.[95] The four-factor framework established by Jinks considers "whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and

---

[91] Ellicott v. Am. Cap. Energy, Inc., 906 F.3d 164, 169 (1st Cir. 2018) (citing Stanton v. Lighthouse Fin. Servs., Inc., 621 F. Supp. 2d 5, 10 (D. Mass. 2009); Allen v. Intralearn Software Corp., 2006 Mass. App. Div. 71, 72 (Mass. Dist. Ct. 2006)).
[92] MASS. GEN. LAWS ch. 149, § 148.
[93] Hilco Mem. of Law at 9–10.
[94] Jinks v. Credico (USA) LLC, 488 Mass. 691 (2021).
[95] Id. at 699 (internal citations omitted).

(4) maintained employment records."[96] No single factor is dispositive. Instead, "it is the totality of the circumstances that will determine whether an entity ought to be considered a joint employer."[97]

"The first two factors 'address the extent of a putative employer's control over the nature and structure of the working relationship.'"[98] "A high level of supervision and control is not an automatic trigger for joint employment," but is "probative of an employment relationship only when the oversight demonstrates effective control over the schedule and conditions of employment."[99] "The second two factors of the framework 'address the extent of a putative employer's control over the economic aspects of the working relationship.'"[100]

The Complaint adequately has alleged facts that support an inference that Hilco was a joint employer.[101] First, for example, Hilco determined which employees would be retained or terminated.[102] On or around August 12, 2023, Mr. Dwyer, Hilco Senior Vice President of Operations, contacted CTS Vice President of Store Operations, Mr. Hoyer, and instructed him that all liquidation sales were ending

---

[96] Id. at 703.

[97] Id. (citing Baystate Alt. Staffing v. Herman, 163 F.3d 668, 676 (1st Cir. 1998)).

[98] Id. at 705 (quoting Baystate Alt. Staffing v. Herman, 163 F.3d at 675).

[99] McCatty v. Stallion Express, LLC, No. CV 24-10224-MRG, 2025 WL 1095926, at *6 (D. Mass. Mar. 14, 2025) (quoting Jacobson v. Comcast Corp., 740 F. Supp. 2d 683, 690 (D. Md. 2010)), report and recommendation adopted, No. 1:24-CV-10224, 2024 WL 5517049 (D. Mass. Mar. 31, 2025).

[100] Jinks v. Credico (USA) LLC, 488 Mass. at 705 (citing Baystate Alt. Staffing v. Herman, 163 F.3d at 676).

[101] See supra § 6.A.

[102] Complaint ¶ 41.

23

and that all CTS employees were to be terminated effective immediately.[103] This reflects direct involvement in the hiring and termination of employees. Second, Hilco controlled employee work schedules and conditions of employment by installing supervisors to oversee and manage CTS stores,[104] and regularly provided instruction and direction to corporate and store-level employees.[105] Third, Hilco managed and controlled employee-relations matters.[106] Fourth, Hilco, through Mr. Fredericks, directed the validation of retention bonus eligibility using its own employees, establishing their involvement in the rate of payment for CTS employees.[107]

Applying the Jinks test here, the allegations in the Complaint support a reasonable inference that Hilco operated as a joint employer.

Hilco argues Jinks does not apply because the Plaintiffs were CTS employees, not third-party workers hired by Hilco. However, Jinks identified the doctrine's basis as control over "terms and conditions of employment" regardless of the structural direction of the hiring relationship.[108]

The Wage Act provides that "[n]o person shall by a special contract with an employee or by any other means exempt himself from this section."[109] The Plaintiffs argue that the Store Closing Agreement's employer disclaimer is a void special

---

[103] Id. ¶ 65.
[104] Id. ¶ 38.
[105] Id. ¶ 38.
[106] Id. ¶ 38.
[107] Id. ¶¶ 56–59.
[108] Jinks v. Credico (USA) LLC, 488 Mass. at 699.
[109] MASS. GEN. LAWS ch. 149, § 148.

contract.[110] Hilco responds that the special contract doctrine applies only to employers, and Hilco is not an employer.[111]

This argument misses the point. The Supreme Judicial Court of Massachusetts has held that the purpose of the Wage Act is to protect employees, and an agreement to circumvent the act is illegal even when voluntary and assented to.[112] This Court's analysis does not turn on whether Hilco is an employer, but on the Wage Act's separate "or by any other means" language, which reaches beyond the employer-status question the parties have briefed.

In the Complaint, Plaintiffs adequately allege that they were employees under the Wage Act, that the Wage Act was violated, and that Hilco qualifies for pleading purposes as a joint employer subject to the Wage Act. Wages earned during the final pay period and accrued and unused vacation pay are "wages" under section 148.[113] On this issue, the Plaintiffs have satisfied the standard for surviving dismissal under Rule 12(b)(6).

---

[110] Pl. Obj. at 14–15.

[111] Id. at 8.

[112] Crocker v. Townsend Oil Co., 464 Mass. at 13; Melia v. Zenhire, Inc., 462 Mass. at 170 (quoting Camara v. Att'y Gen., 458 Mass. at 760–61).

[113] See Rossman v. Nashoba Reg'l Sch. Dist., No. 3:21-cv-40042-KAR, 2024 U.S. Dist. LEXIS 154453, at *22 (D. Mass. Aug. 28, 2024) (interpreting MASS. GEN. LAWS ch. 149, § 148, requiring employers to pay each employee "weekly or bi-weekly . . . the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed or five to six days in a calendar week," and to pay any employee discharged from employment in full on the day of his discharge); Dixon v. City of Malden, 464 Mass. 446, 450 (2013) (vacation pay are wages under section 148).

### ii.   Retention Bonuses

The Supreme Judicial Court of Massachusetts held in <u>Nunez v. Syncsort Inc.</u> that retention bonuses governed by a conditional agreement are "additional, contingent compensation outside the ambit of the Wage Act" because they are "not made solely in exchange for the plaintiff's labor or services."[114] In <u>Nunez</u>, the plaintiff and Syncsort entered into a retention bonus agreement during a merger where the plaintiff's position became part-time and his salary was reduced commensurate with the reduction in his hours.[115] The first paragraph of the agreement specified that the retention bonus was "an incentive for [the plaintiff] to continue to contribute [their] efforts, talents and services to [Syncsort] during this time of change and integration" for the company.[116] The CTS retention bonuses — conditioned on employees remaining through the end of their respective store's closing — are materially similar to the Syncsort bonuses. As such, under <u>Nunez</u>, the Plaintiffs cannot recover compensation under the Wage Act for undelivered bonuses.

Footnote 7 in <u>Nunez</u> confirms that the special contract doctrine exists and applies to agreements that "circumvent the requirements of the Wage Act," but that doctrine operates within the Wage Act's scope.[117] Under the precedent set by <u>Nunez</u>, retention bonuses fall outside the jurisdiction of the Wage Act because they are

---

[114] <u>Nunez v. Syncsort Inc.</u>, 496 Mass. 706, 712 (2025).
[115] <u>Id.</u>
[116] <u>Id.</u> at 707.
[117] <u>Id.</u> at 711 n. 7.

contingent compensation rather than wages, and the special-contract doctrine operates only within the Wage Act's scope as to wages. Accordingly, a party characterizing retention bonuses as a "special contract" cannot use that label to bring them back under the statute's coverage.

For these reasons, the Court dismisses Count 1 only as it pertains to the retention bonuses. This does not, however, require dismissal in full of Count 1.

### C. Count 2: Intentional Misrepresentation

Under Massachusetts law, an intentional misrepresentation claim requires that "(1) the defendant made a statement; (2) the statement was knowingly false; (3) the defendant made the false statement with the intent to deceive; (4) the statement was material to the plaintiff's decision; (5) the plaintiffs reasonably relied on the statement; and (6) the plaintiffs were injured as a result of their reliance."[118]

Hilco argues that Count 2 must be dismissed because the Complaint does not allege a direct representation from Hilco to the Plaintiffs and that even the indirect representation through Mr. Fredericks to Mr. Salkovitz is not pleaded with the particularity required by Rule 9(b).[119] Federal Rule of Civil Procedure 9(b), as made applicable by Bankruptcy Rule 7009, requires that parties alleging fraud "must state with particularity the circumstances constituting" the fraud, but may generally allege "conditions of a person's mind" such as malice, intent or

---

[118] In re Access Cardiosystems, Inc., 404 B.R. 593, 639 (Bankr. D. Mass. 2009).
[119] Hilco Mem. of Law at 11–14.

knowledge.[120] This requires pleading the "time, place, and content" of the alleged misrepresentation — the "who, what, when, where, and how."[121]

Massachusetts courts have recognized a cause of action for misrepresentation to third parties under a theory of indirect reliance for "misrepresentation[s] made by [d]efendant to such third parties if the [d]efendant intended, or had reason to expect, that on repetition, the statements would influence [p]laintiff's conduct to [p]laintiff's detriment."[122] However, a claim of indirect misrepresentation requires that "the 'terms' of the alleged misrepresentation . . . 'be repeated,' or its 'substance communicated' . . . to the complaining party in order for an action to lie."[123]

The Complaint alleges that Mr. Fredericks, on behalf of Hilco and ReStore, specifically represented to Mr. Salkovitz that Hilco/ReStore would fund retention bonuses.[124] Mr. Fredericks authorized payment of the bonuses and specifically knew or should have known CTS would transmit the promise to store-level employees.[125] CTS emailed employees the promise and the employees subsequently relied on such promise in making their decision to remain in their employment.[126] Exhibit A to the

---

[120] Fed. R. Civ. P. 9(b).

[121] See U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC, 812 F.3d 294, 306–07 (3d Cir. 2016); First Choice Armor & Equip., Inc. v. Toyobo Am., Inc., 717 F. Supp. 2d 156, 161 (D. Mass. 2010).

[122] Reed Paper Co. v. Procter & Gamble Distrib. Co., 807 F. Supp. 840, 845 (D. Me. 1992) (citing Restatement (Second) of Torts § 533); Sebago, Inc. v. Beazer E., Inc., 18 F. Supp. 2d 70, 86 (D. Mass. 1998).

[123] Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co., 577 F. Supp. 1281, 1287 (D. Mass. 1983) (citing Restatement (Second) of Torts, § 553 (1977)).

[124] Complaint ¶¶ 42–43.

[125] Id. ¶¶ 46, 83.

[126] Id. ¶¶ 46–48, 84-85.

Complaint — the July 26 Text Messages between Mr. Fredericks and Mr. Salkovitz — furnishes the particular facts required by Rule 9(b). The "who" is Mr. Fredericks, the "what" is the commitment to fund bonuses already in the budget, and the approximate "when" is July 26, 2023, confirming prior oral representations made in or around late June to early July 2023.[127] The "where" and "how" are the text messages between Mr. Fredericks and Mr. Salkovitz.

Hilco contends that a CTS email to employees "at or around the start of Additional Store Liquidation sales," with those sales going to end on July 30, 2023, preceded the July 26 Text Messages in time, meaning Mr. Fredericks's text cannot serve as the basis for a misrepresentation that was communicated to employees before the text was sent.[128] As alleged in paragraph 42 of the Complaint, the Plaintiffs respond that the text messages confirm a prior oral representation by Mr. Fredericks, not that they constitute the original representation.[129] The Plaintiffs allege the oral representation by Mr. Fredericks to Mr. Salkovitz occurred "at or around the time" of the default notice in late June to early July 2023.[130] The July 26 Text Messages corroborate that prior commitment. The Complaint adequately alleges the representation. Taken together, the allegations in the Complaint and the

---

[127] See U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC, 812 F.3d at 306–07; First Choice Armor & Equip., Inc. v. Toyobo Am., Inc., 717 F. Supp. 2d at 161.
[128] Hilco Mem. of Law at 13–14; Complaint ¶ 50.
[129] Pl. Obj. at 20–22.
[130] Complaint ¶ 42.

July 26 Text Messages set out the "who, what, when, where, and how" of the alleged misrepresentation. Therefore, Rule 9(b) is satisfied.

As for the remaining elements of an intentional misrepresentation claim, the Plaintiffs allege that when Hilco made a representation to CTS that Hilco/ReStore intended to pay retention bonuses, "Hilco never intended for Hilco/ReStore to fund the retention bonuses,"[131] and that "[a]t the time [Mr. Fredericks] agreed that Hilco/ReStore would provide funding for the retention bonuses, he either knew or should have known that Hilco/ReStore never intended to actually fund the retention bonus payments given CTS's default on the Loan Agreement and how poorly the liquidation sales were going."[132] These two statements support the allegation that Hilco intended to deceive the Plaintiffs, establishing the scienter element of intentional misrepresentation. The materiality of Hilco's message is evidenced by the fact that CTS subsequently informed their employees that they would be paid a retention bonus if they remained employed through the end of their store's respective liquidation sale.[133] Acting in reliance on this assurance of payment, the Plaintiffs continued working and suffered injury when they remained uncompensated.

Hilco argues Mr. Corbin is not a proper plaintiff under Counts 2 through 4 because he was a corporate employee rather than a store-level associate.[134] Counts 2

---

[131] Id. ¶ 82.
[132] Id. ¶ 47.
[133] Id. ¶ 85.
[134] Hilco Mem. of Law at 14.

30

through 4 are brought on behalf of Massachusetts Subclass store-level employees and the Nationwide Subclass, which ultimately limits Counts 2 through 4 to store-level employees.[135]

Mr. Corbin is not a store-level employee, and cannot pursue claims on behalf of the store-employee classes. However, Mr. Seronick, a store-level associate, may do so.

### D. Count 3: Negligent Misrepresentation

A claim for negligent misrepresentation must allege that the defendant "(1) in the course of his business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance on the information, and that he (6) failed to exercise reasonable care or competence in obtaining or communicating the information."[136] Under Massachusetts law, "only statements of a factual nature that are false when made give rise to a cause of action for . . . negligent misrepresentation.[137] "False statements of opinion, of conditions to exist in the future, and promises to perform an act cannot sustain a claim for negligent misrepresentation, unless the promisor had no intention to perform the promise at

---

[135] Complaint ¶¶ 68(a)–(b).
[136] Gossels v. Fleet Nat'l Bank, 453 Mass. 366, 371–72 (2009).
[137] Robert E. Ricciardelli Carpet Serv., Inc. v. Home Depot U.S.A., Inc., 679 F. Supp. 2d 192, 208 (D. Mass. 2009) (citing Cummings v. HPG Int'l, Inc., 244 F.3d 16, 21 (1st Cir. 2001)).

the time it was made."[138] "An individual who makes negligent misrepresentations has honest intentions but has failed to exercise due care."[139]

To survive a motion to dismiss, a claim of negligent misrepresentation must plausibly allege that the defendant had no intention of doing what it promised when it made a statement to the plaintiff.[140] An "intention not to perform a promise" at the time the promise was made cannot be inferred merely from "nonperformance of the promise."[141] This future-conduct limitation under Massachusetts law is well-established.[142]

Count 3 fails, and the defect is one that no repleading of the same representation can cure. Negligent misrepresentation under Massachusetts law reaches only a false statement of existing fact.[143]

That requirement is why Count 3 cannot proceed. A promise of future performance becomes actionable only if the promisor had no intention to perform when the promise was made. In that circumstance, the claim sounds in intentional misrepresentation, not negligence. If the promise was honestly made, it is not

---

[138] Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 474 (2009).

[139] Sound Techs. v. Hoffman, 737 N.E.2d 920, 926 (Mass. App. Ct. 2000).

[140] See Estate of Geftas v. PM & Family, Inc., No. MICV2013-00687, 2013 Mass. Super. LEXIS 251, at *4 (Mass. Super. Ct. May 20, 2013) (finding the defendant's statements that it would screen, train, and supervise caregivers were promissory, and that the plaintiffs could not press their "false promise" misrepresentation claim because they alleged no facts plausibly suggesting that the defendant had no intention of doing what it promised when it published their statements in brochures and on its website).

[141] Galotti v. U.S. Tr. Co., 140 N.E.2d 449, 452 (Mass. 1957).

[142] Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. at 474.

[143] Zimmerman v. Kent, 31 Mass. App. Ct. 72, 79 (Mass. App. Ct. 1991).

actionable; if it was made without a present intent to perform, it is a claim for deceit. The Complaint therefore does not allege a negligent misrepresentation, because it pleads only a promise of future conduct rather than a false statement of present fact.

The only representation the Complaint attributes to Hilco is promissory. The Plaintiffs allege that "Hilco/ReStore intended to pay retention bonuses."[144] That is a promise to perform a future act. Whether a statement is promissory in character, and thus outside the reach of a misrepresentation claim, is a question of law for the Court where the statement is unambiguously a promise. This one is. The representation concerns what Hilco would do, not a fact that existed when the statement was made.

This distinction matters. It makes this case different from the cases in which a negligent misrepresentation claim survives alongside a promise of future conduct. In Geftas, the promissory statements that the agency would screen and supervise its caregivers could not support the claim, but a separate representation of existing fact, that a particular caregiver placed in the home was trustworthy, could.[145] The Plaintiffs identify no analogous representation of present fact here. Their theory rests entirely on the promise to fund the bonuses. This future-conduct limitation, therefore, disposes of the entire count.

---

[144] Complaint ¶ 88.
[145] Estate of Geftas v. PM & Family, Inc., 2013 Mass. Super. LEXIS 251, at *3–5.

Rule 8(d)'s allowance for alternative, even inconsistent, theories does not change the result. Rule 8(d) permits a party to assert intentional and negligent misrepresentation as alternative and even inconsistent theories.[146] The flaw in Count 3 is not its inconsistency with Count 2. It is that the lone representation pleaded falls outside the tort of negligent misrepresentation as a matter of law, whichever count it is attached to.

For these reasons, amendment would be futile, and Count 3 is dismissed with prejudice.[147]

The Court reaches this result on the merits and does not rest it on forfeiture. The point bears noting only because Hilco pressed it. The Plaintiffs' opposition recited the elements of negligent misrepresentation without engaging Hilco's argument that the alleged statement is an unactionable promise of future conduct, and without citing authority. A litigant who fails to respond to a dispositive argument ordinarily forfeits opposition to it. The Court need not invoke that principle, because the claim fails on its face for the reasons stated, and a merits dismissal is the sounder and more complete ground.

### E. Count 4: Unjust Enrichment

Unjust enrichment is the "retention of money or property of another against the fundamental principles of justice or equity and good conscience."[148] More

---

[146] Fed. R. Civ. P. 8(d)(2)–(3).

[147] See Foman v. Davis, 371 U.S. 178, 182 (1962) (futility justifies denial of leave to amend).

[148] Santagate v. Tower, 64 Mass. App. Ct. 324, 329 (Mass. App. Ct. 2005) (citations omitted).

concretely, under recent authority,"[t]o succeed on an unjust enrichment claim, a plaintiff must establish that (1) it 'conferred a measurable benefit' on the defendant, (2) it 'reasonably expected compensation,' and (3) 'the defendant accepted the benefit with knowledge' of that reasonable expectation."[149] The benefit conferred on the defendant must be measurable.[150]

Hilco's principal answer to Count 4 is that the Plaintiffs have an adequate legal remedy and therefore cannot pursue an equitable one. The premise is a correct statement of Massachusetts law. An equitable claim for unjust enrichment is not available to a party who has an adequate remedy at law. The test looks to the availability of that remedy, not to whether the party ultimately prevails on it.[151] A plaintiff cannot preserve an unjust enrichment claim merely by alleging that the legal remedy might fail.[152]

However, that does not mean that the dismissal is warranted here. First, the availability of the Plaintiffs' legal remedy is itself contested and depends on the same employer-status question that drives Count 1. If Hilco is the joint employer, the Wage Act supplies the Plaintiffs' remedy, and the equitable claim falls away. If Hilco is not an employer, the Wage Act claims fail, and equity remains the Plaintiffs' only recourse for the benefit they allege they conferred on Hilco. Where

---

[149] <u>Tody's Serv., Inc. v. Liberty Mut. Ins. Co.</u>, 496 Mass. 197, 200 (2025) (quoting <u>Columbia Plaza Assocs. v. Northeastern Univ.</u>, 493 Mass. 570, 589 (2024)).
[150] <u>Lockwood v. Madeiros</u>, 506 F. Supp. 3d 73, 81 (D. Mass. 2020).
[151] <u>Shaulis v. Nordstrom, Inc.</u>, 865 F.3d 1, 16 (1st Cir. 2017); <u>Tomasella v. Nestlé USA, Inc.</u>, 962 F.3d 60, 82–84 (1st Cir. 2020).
[152] <u>Tomasella v. Nestlé USA, Inc.</u>, 962 F.3d at 84.

the existence of the adequate legal remedy turns on a disputed question that cannot be resolved at the Rule 12(b)(6) stage, a plaintiff may plead unjust enrichment in the alternative, and dismissal of the equitable claim is premature.[153] This is the feature that distinguishes the cases on which Hilco relies. In each, the adequate legal remedy was indisputably available to the plaintiff, and the only question was whether the plaintiff would win on it. Here, whether the legal remedy reaches Hilco at all is the unresolved issue.

Second, under Nunez, the retention bonuses are not recoverable under the Wage Act. The Plaintiffs' only avenue for recovery of the bonuses is the misrepresentation theory, which is itself an alternative claim whose viability remains contested. The Plaintiffs are not required at this stage to elect between that legal theory and the equitable one before the availability of either is settled.

Third, no express contract between these parties bars the claim. The rule that quasi-contract yields to an express agreement operates only as between the parties to that agreement. The Plaintiffs were not parties to the Store Closing Agreement. There is no governing contract between the Plaintiffs and Hilco, so the express-contract bar does not apply.

On the benefit element, the Complaint identifies a concrete and measurable benefit conferred on Hilco. During the liquidation, the Plaintiffs and the subclass sold Hilco's Additional Consultant Goods, and under the Final Store Closing Order

---

[153] Lass v. Bank of Am., N.A., 695 F.3d 129, 140 (1st Cir. 2012).

36

Hilco retained 92.5 percent of the gross proceeds of those sales.[154] The Plaintiffs' labor produced the sales. Hilco knew of and accepted that benefit, having staffed, supervised, and directed the closing sales it was paid to conduct. The retention bonuses are the consideration Hilco is alleged to have promised to secure that labor through the closing. The Plaintiffs allege that Hilco induced them to remain and generate those sales on the promise of bonuses, and that Hilco took the resulting proceeds and then failed to make the promised payments.

To the extent Count 4 rests on the Plaintiffs' final-period wages and accrued vacation, it adds nothing. Those amounts were paid, as alleged, and the Complaint does not allege that Hilco retained any corresponding benefit from them. The viability of the unjust enrichment theory is limited to the retention bonuses and to the sale proceeds Hilco retained.

The Court therefore declines to dismiss Count 4. Hilco's adequate-remedy defense is better addressed once Hilco's status as an employer and the viability of the Plaintiffs' legal theories are resolved and the Court can determine whether an adequate remedy at law was in fact available.

## VII.   CONCLUSION

The Court grants in part and denies in part Hilco's motion to dismiss the First Amended Class Action Complaint. As to Count 1, the motion is granted insofar as the claim seeks recovery of retention bonuses, which fall outside the Wage Act under <u>Nunez</u>, and that portion of Count 1 is dismissed with prejudice; the motion is

---

[154] Complaint ¶¶ 19(g), 20; Store Closing Order ¶¶ 11–14.

denied in all other respects as to Count 1, which survives as to unpaid final wages and accrued vacation pay.

As to Counts 2 and 4, the motion is granted with respect to Mr. Corbin, who, as a corporate-office employee, is not a member of the store-level subclasses on whose behalf those counts are brought, and his claims under Counts 2 and 4 are dismissed. The motion is denied as to Mr. Seronick and the store-level subclasses he represents, and Counts 2 and 4 survive as asserted on their behalf.

As to Count 3, the motion is granted, and Count 3 is dismissed with prejudice as to both Plaintiffs.

The Court will enter a separate order consistent with this opinion.

Dated: July 1, 2026
Wilmington, Delaware

_____
Thomas M. Horan
United States Bankruptcy Court